## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

KEHOE COMPONENT SALES
INC., d/b/a PACE ELECTRONIC
PRODUCTS,

        Plaintiff,

        v.

BEST LIGHTING PRODUCTS,
INC.,

        Defendant.

Case No. 2:08-CV-00752
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

KEHOE COMPONENT SALES
INC., d/b/a PACE ELECTRONIC
PRODUCTS, *et al.*,

        Plaintiffs,

        v.

BEST LIGHTING PRODUCTS,
INC.,

        Defendant.

Case No. 2:10-CV-00789
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

### OPINION AND ORDER

These consolidated diversity cases stem from a contractual dispute between

Plaintiff/Counter-Defendant Kehoe Component Sales, Inc., d/b/a Pace Electronic Products

(hereinafter "Pace Electronic"); Plaintiff/Counter-Defendant Pace Technology Co., Ltd.

(hereinafter "Pace Technology");[1] and Defendant/Counter-Claimant Best Lighting Products, Inc.

---

[1] The Court will refer to Pace Electronic and Pace Technology collectively as
"Plaintiffs." As discussed below, the disputes between the parties also involve another Pace
affiliate, Pace Products, Ltd. (formerly known as Max-Lion Corporation Limited). The Court

(hereinafter "Best").  This matter is before the Court for consideration of the parties Cross-

Motions for Summary Judgment.  (*See* ECF Nos. 54, 64, 66.[2])  For the reasons that follow:

- Defendant/Counter-Claimant Best Lighting Products, Inc.'s Motions for Summary Judgment are **DENIED**.  (ECF Nos. 54, 66.)

- Plaintiffs' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part subject to the conditions outlined in this Opinion and Order.  (ECF No. 64.)

- Plaintiffs' Complaint in Case No. 2:10-cv-789 is **DISMISSED** without prejudice subject to the conditions outlined in this Opinion and Order.

- The Clerk is **DIRECTED** to **STRIKE** the Declaration of James J. Hooley.  (ECF No. 72-1.)

## I. BACKGROUND

### A.    Factual Background

#### 1.    Best's Pre-2007 Relationship with the Pace Companies

Alvin Katz ("A. Katz") founded Best, an Ohio corporation, in 1995.  (A. Katz Dep. 5,

ECF No. 52-1.)  Best sells emergency lighting products, emergency ballasts, exit lighting, and

related products.  A. Katz testifies that, in creating Best's product line, he came up with hand-

drawn concepts and designs for Best products.  (*Id.* at 40, 71.)  A. Katz states that he would

sometimes start with samples from other manufacturers when making Best products.  (*Id.* at 42,

72.)

In approximately 2000, Pace Electronic—a New York corporation—approached Best

---

will refer to all three affiliated companies collectively as the "Pace companies."

  [2] As described further below, Case No. 2:08-cv-752 was consolidated with Case Number 2:10-cv-789.  Citations to the electronic docket shall generally refer to Case Number 2:10-cv-789 unless Case No. 2:08-cv-752 is explicitly referenced.

offering to manufacture its products. (*See id.* at 56–57; Kehoe Dep. 38, ECF No. 52-4.)

Eventually, a relationship developed in which Pace Electronic and its affiliates manufactured

products for Best. (*See* Katz Dep. 62.) According to F. Patrick Kehoe ("Kehoe")—the CEO of

Pace Electronic and partial owner of the other Pace companies—Pace Technology, a Pace

affiliate based in China, began making molds (also referred to as "tooling") to produce Best

products beginning in 2000. (Kehoe Dep. 7, 40, ECF No. 52-4.) Kahoe avers that the Pace

companies made this tooling from "garden variety samples that we got from the marketplace."

(*Id.* at 89.) A. Katz testifies that Best also submitted orders to other suppliers from 2000 to 2006.

(*See* A. Katz Dep. 81–83.)

Beginning in 2004, and more prominently in 2005, Best became concerned that the Pace

companies were selling lighting products to Best's customers. (*See id.* at 96–99.) In August

2004, A. Katz sent Kehoe an email indicating that Best did not want the Pace companies giving

quotes to Best's customers. (*Id.* at 96; Pl.'s Mot. Summ. J. Ex. D, ECF No. 64-3.) In March

2005, Kahoe emailed A. Katz assuring him that Pace Electronic, Pace Technologies, and another

Pace affiliate, would not offer emergency lighting products to any of Best's customers in North

America without Best's permission. (A. Katz Decl. Ex. 6, ECF No. 54-1.) A. Katz avers,

however, that during 2005 Best discovered that—despite written assurance from Pace

Electronic—Pace Electronic and its affiliates had been selling lighting products to Best's

customers. (A. Katz Decl. ¶ 4, ECF No. 54-1.) On October 11, 2005, A. Katz sent two emails to

Kehoe expressing considerable displeasure based on his belief that Pace Electronic and its

affiliates were "back door selling" products made with Best's tooling to multiple customers.

(Pl.'s Mot. Summ. J. Ex. D at 2–3.) Kahoe responded to these emails maintaining that he had

3

not purposely competed with Best and that he considered Best to be a partner. (A. Katz Decl. Ex. 4, ECF No. 54-1.)

      During this same general period, in April 2005, a dispute arose between the Pace companies and Best regarding defective products and the ownership of tooling. (A. Katz Dep. 102–04.) A. Katz testifies that he had a disagreement with Peter Yang, a part owner of Pace Technology, regarding whether Pace Technology or Best owned the tooling that the Pace companies were using to make Best's products. (*Id.* at 102–03.) During his deposition, A. Katz expressed the belief that "over the course of the years" he had paid for some of the tooling in question but that he had not paid for all of the tooling. (*Id.* at 106.) According to Jeffrey Katz ("J. Katz"), the CEO of Best, during this period the Pace companies sent Best a bill for outstanding tooling payments. (J. Katz Dep. 100, ECF No. 96.) During the same period, Best claimed that it was forced to pay approximately $300,000 to correct defective products from the Pace companies. (A. Katz Dep. 103–04.) In a transaction that the parties refer to as the "big wash," Best received ownership of the tooling in question in exchange for the expenses it was claiming to repair the alleged defect in products. (*See id.* at 104–05; J. Katz Dep. 100.) An April 19, 2005 email from Kehoe described the transaction as follows: "[t]ooling - Pace will accept the proposal to wash all pending tooling cost against the pending rework charge without any contingency." (Katz Decl. Ex. 3.) Pace Electronic also submitted a list dated March 23, 2005—which was originally an exhibit to the Kehoe deposition—that sets forth various tooling charges purportedly pending at that time. (Hull Decl. Ex. B, ECF No. 71-1.)

      In 2006, the relationship between Best and the Pace companies continued to dissolve. During 2006, A. Katz avers that Best still believed that the Pace companies were actively selling

lighting products to Best's customers. (*See* A. Katz Decl. ¶ 4.) Moreover, according to Kehoe, Best owed the Pace companies approximately $ 1.5 million and was refusing to pay. (Kehoe Dep. 46.)

In light of these circumstances, the companies engaged in negotiations during late 2006 and into 2007. (Katz Decl. ¶ 5.) A. Katz avers that in light of Best's concern over Pace companies selling competing products, it was seeking "enforceable assurances" in order to continue the relationship. (*Id.* at ¶ 6.) During this general period, Kehoe made a number of statements to Best assuring them of his trustworthiness. For example, on November 27, 2006 Kehoe emailed Katz stating "I swear on my saintly mother's grave my motivation is not to raid your customer list" and promising that he would not violate a non-compete under any circumstances. (Katz Decl. Ex. 1, ECF No. 54-1.) Two days later, Kehoe stated that the Pace companies would accept a one year non-compete agreement. (Katz Decl. Ex. 5, ECF No. 54-1.) Finally, A. Katz avers that during a meeting in which the companies negotiated the final terms of an agreement, Kehoe specifically represented that the Pace companies would not sell lighting products to any of Best's North American customers without written authorization. (A. Katz Decl. ¶ 10.)

Despite Kehoe's representations, the record reflects that Best still mistrusted him during the course of negotiations. During his deposition, A. Katz specifically stated "[n]o way in God's name did I trust [Kehoe] in 2006 . . . ." (A. Katz Dep. 118.) Moreover, within his Declaration, A. Katz avers that because Best mistrusted Kehoe it would not have entered an agreement with Pace without "a strict written agreement" limiting Pace's ability to sell products in North America. (A. Katz Decl. ¶¶ 8, 12.) Richard Melbourne Haughton, a former Vice-President at

5

Best, similarly testified:

> The purpose of [the negotiations] was to put in place what we believed to be a legally enforceable agreement that would govern the conduct of the parties moving forward in a commercial relationship, because the past had indicated to us things like a handshake or my word, quote/unquote, from Pat Kehoe, would not provide us with any reasonable security that the relationship would proceed on acceptable terms, and we needed something enforceable.

(Melbourne Haughton Dep. 64–65, ECF No. 52-2.)

### 2. 2007 Supply Agreement

Best, Pace Electronic, and Pace Technology ultimately entered into an agreement (the "Supply Agreement") which became effective on January 10, 2007.[3] Pace Products, Ltd. (formerly known as Max-Lion Corporation Limited), another Pace affiliate (hereinafter "Pace Products"), was also a party to the agreement.[4] Under the Supply Agreement, Best agreed to purchase $ 7,000,000 worth of products from the Pace companies annually.[5] The Supply Agreement fixed prices for the relevant products with the caveat that "the Parties agree[d] to review prices for Products on a bi-annual basis based on the Effective Date . . . ." (Supp. Agr. 1.) The Supply Agreement required Best to place purchase orders directly with Pace Electronic. (*Id.*) The duration of the Supply Agreement was one year from the effective date, January 10, 2007, with either party having the ability to submit a written request for renewal within thirty days of expiration. (*Id.*)

---

[3] The Supply Agreement is attached as Exhibit 1 to the Declaration of Gregory P. Barnwell, ECF No. 66-1. For the purposes of this Opinion and Order, the Court will cite to this document as "Supp. Agr."

[4] The Supply Agreement refers collectively to all three companies as "Pace."

[5] The Supply Agreement also set forth a payment schedule for unpaid balances between Best and Pace Products. (Supp. Agr. 3.)

6

The Supply Agreement contained non-compete provisions that provided as follows:

> During the term of the agreement, Pace shall not sell emergency lights or exit signs nor ballasts, nor solicit sales of these items to any party in North America without Best's prior written consent. Such sales, if approved by Best, shall be subject to a commission to be paid by Pace to Best. Penalties for violation of the non-compete provision shall be paid by Pace to Best at the rate of $500,000 per occurrence.
>
> Pace shall be authorized to sell [to] customers specified in the Schedule "B" to this Agreement under the conditions specified therein;
>
> Pace shall disclose to Best all emergency lighting/exit/ballast product shipments by customer including selling price and terms made by Pace to all customers in North America for the last two years.
>
> If Pace terminates this Agreement, Pace shall not sell emergency lighting, exit signs or exit lighting or ballast products in North America for a period of one year from the effective date of termination of the Agreement . . . .

(*Id.* at 2.)

In addition to the various non-compete provisions, the Supply Agreement also included an assignment provision that provided as follows:

> Pace shall not use any tooling owned by Best other than for the manufacturer of products for sale to Best, and assigns to Best all designs and intellectual property (and all derivations thereof) for products developed or to be developed at or by Pace for Best.

(*Id.*) Finally, the Supply Agreement also included a warranty provision stating that "Pace shall warrant the goods as to quality and conformance with specifications; Pace shall bear all costs of replacement and rework of any Products proven to contain manufacturing defects, including but not limited to return of defective goods to source of manufacture . . . ." (*Id.*)

### 3. Supply Agreement Disputes

As detailed further below, this controversy centers around the parties actions following

the 2007 Supply Agreement and how to interpret such actions in light of the Supply Agreement.[6] The parties dispute how to characterize the Pace companies product shipments in 2007; the nature of price increases during the course of the Supply Agreement; the creation of products and the use and ownership of tooling; and remaining payment obligations under the Supply Agreement. The Court will summarize the relevant factual evidence concerning these issues.

### a. 2007 Product Shipments

Best maintains that shortly after January 10, 2007 the Pace companies sold products to non-approved third parties in North America in violation of the agreement.[7] Best specifically provides the business records of four companies: Astralite, Inc. ("Astralite"); Mule Lighting, Inc. ("Mule Lighting"); Lightworld, Inc. ("Lightworld"); and Heiser, Inc. ("Heiser"). Astralite records reflect that it received shipments of emergency lighting products (and invoices) from Pace Electronic on at least ten separate occasions—ranging from January 17, 2007 until September 11, 2007—during the life of the Supply Agreement.[8] (*See* Yu Decl. Exs. 3–26, ECF No. 54-2.) Additionally, business records from Mule Lighting reflect that it received a shipment of lighting products from Pace Products during the life of the Supply Agreement and paid for these products in June 2007. (*See* Cross Decl Exs. 6, 11, ECF No. 54-4.) Lightworld records

---

[6] Best also maintains that the Pace companies conduct forms the basis for several independent causes of action.

[7] "Schedule B" of the Supply Agreement set forth companies that the Pace companies could sell to during the effective period. (Supp. Agr. 11.) These companies were Acuity Brands a/k/a Lithonia Lighting and Chloride Systems division of Genlyte Group. (*Id.*) Schedule B also set forth agreements as to Howard Lighting and Thomas & Betts. (*Id.*)

[8] From the records produced, there is no indication that Astralite paid for the last three shipments in 2007. (*See* Yu Decl. Exs. 22–26, ECF No. 54-2.)

8

similarly indicate that it received lighting products from Pace Products during the Supply

Agreement period and paid for these products in June 2007.  (*See* Cross Decl. Exs. 2–5, ECF No.

54-3.)  Finally, the record shows that Heiser received emergency lighting products from Pace

Electronic in April 2007 and that it ultimately paid for those products in May 2007.  (Dick Decl.

¶ 3, ECF No. 87-4, Case No. 2:08-cv-752; *see also* Dick Decl. Ex. 1., ECF No. 54-5.)  According

to Best, it began to suspect that the Pace companies had been selling identical emergency lighting

products when, sometime in 2009, a customer returned to Best a product bearing Pace's name.

(*See* Pratha Dep. 87–91, ECF No. 74.)

Pace Electronic does not dispute that the Pace companies shipped products to non-

approved North American companies during the effective period of the 2007 Supply Agreement.

(*See* Kehoe Dep. 103–04.)  Pace Electronic asserts, however, that all of the 2007 shipments in

question were pursuant to purchase orders that pre-dated the Supply Agreement.  Specifically,

Pace Electronic highlights that the business records of Astralite include only two purchase orders,

dated October 23, 2006 and November 9, 2006.  (Yu Decl. Exs. 1–2, ECF No. 54-2.)  Moreover,

Pace Electronic submits a purchase order between Pace Products and Mule Lighting dated

December 19, 2006.  (Zimmer Decl. Ex. 2, ECF No. 87-2, Case No. 2:08-cv-752.)  Likewise,

Lightworld business records state that the date of the purchase order in question was December

19, 2006.  (Cross Decl. Ex. 2, ECF No. 54-3.)  Finally, with regard to Heiser, John K. Dick, CEO

of Heiser, avers that Heiser placed the relevant purchase order with Pace Electronic on January 3,

2007.  (Dick Decl. ¶ 3.)  According to Kehoe, he discussed these pending purchase orders with

Best when the parties negotiated the Supply Agreement.  (Kehoe Dep. 104–05.)

### b.     Price Increases

The parties also dispute the nature of price increases that occurred during the effective period of the Supply Agreement.  The evidence indicates, and Pace Electronic concedes, that the Pace companies sought increases from the prices listed in the Supply Agreement.  For example, In April 2007, Kehoe sent an email to Dave Melanson, a Best employee, asking him to confirm an increase in price of PolyCarbonate Vandal/Environmental Shield Guards from $ 13.15 (under the Supply Agreement) to $14.30 due to "material price increase."  (Def.'s Mem. Opp'n Summ. J. Ex. C at 2, ECF No. 75-1.)  On May 21, 2007, Kehoe sent various Best employees, including A. Katz, an email discussing increase in battery costs due to the increased cost of metal and asking for approval to proceed with "unacknowledged orders." (*Id.* at 3.)  A June 4, 2007 email from Kehoe to A. Katz and other Best employees indicates that the parties were negotiating increased prices due to the cost of materials. (Def.'s Mem. Opp'n Summ. J. Ex. B, ECF No. 75-1.)

The record evidence reflects that employees for both Best and the Pace companies continued to exchange emails regarding price increases, at least sporadically, throughout the remainder of 2007. (*See* Def.'s Mem. Opp'n Summ. J. Ex. D, ECF No. 75-1).  In July 2007, J. Katz sent Kehoe an email expressing frustration with a price increase.  (*Id.* at 3.)  J. Katz told Kehoe that he would not reissue the orders in question based on the higher quoted price.  (*Id.*)

In discussing price increases, A. Katz testified that Kehoe would force him to accept price increases for pending orders.  (A. Katz Dep. 149.)  According to A. Katz, he had no other place to go at the time Kehoe demanded price increases. (*Id.* at 150.)  A. Katz further stated that Kehoe would threaten not to ship orders unless Best agreed to the price increases. (*Id.* at

10

149–50.) At the same time, however, A. Katz and other Best employees indicated that they did use other suppliers during 2007. (*See* A. Katz Dep. 153; Melbourne Haughton Dep. 27.) Finally, deposition testimony reflects that Best also, on at least one occasion, attempted to renegotiate a price within the Supply Agreement. (A. Katz Dep. 138; *see also* Def.'s Mem. Opp'n Summ. J. Ex. C at 1.)

<b>c. Creation of Products and Use of Tooling</b>

The parties have presented evidence regarding Pace's production of emergency lighting products involving the ownership and use of tooling. As detailed above, Kehoe states that the Pace companies originally made tooling when they began working with Pace in 2000, based on "garden variety samples" available in the marketplace. (Kehoe Dep. 88–89.) Kehoe further states that the tooling for such products would wear out and have to be replaced and that the Pace companies would pay to replace it. (*Id.* at 87.) Kehoe estimates that Pace had replaced tooling ten times for high volume products. (*Id.*) During his deposition, Kehoe went through the products listed within "Schedule A" of the Supply Agreement, indicating that the Pace companies made some products using Best's tooling, while they made other products using the tooling of the Pace companies. (*Id.* at 77–83.) Kehoe avers that Pace manufactured certain select "die cast" fixtures, for its own account, using Best's tooling with Best's approval. (*Id.* at 81, 91.) Kehoe denies that there was any design or intellectual property that Pace developed for Best. (*Id.* at 99.) According to Kehoe, Best provided the Pace companies with "existing jelly bean" samples and the Pace companies made the necessary tooling to manufacture the product. (*Id.* at 127.)

The parties also cite to the testimony of Imo Wang, a former Pace Technology employee,

11

concerning the creation of products and tooling. Imo Wang was a factory manager for Pace

Technology from 2004 until 2012, and was involved in the manufacturing of emergency lighting

products. (Wang Dep. 8–9, ECF No. 52-3.) Mr. Wang avers that, in all but one instance, when

Best wanted a new product it would bring Pace Technology a sample product and have Pace

Technology copy the product.[9] (*Id.* at 9.) Mr. Wang testifies that due to the high volume of

products Pace Technologies had more than one set of tooling. (*Id.* at 42.) Mr. Wang also

confirms that Best paid for its tooling in the big wash. (*Id.* at 67.) Mr. Wang further explains

that the relevant emergency lighting products have date codes. (*Id.*) According to Mr. Wang, the

date codes indicate when a product was assembled and tested, not when the product's parts were

molded and cast. (*Id.* at 72.) Mr. Wang avers that sometimes molded parts could sit for up to

five years before assembly and testing. (*Id.* at 72–74)

In addressing the Pace companies' use of tooling, Best further directs the Court to

evidence regarding the similarity between Pace and Best products. For example, Best submits

the expert reports of Joshua Broehl. (*See, e.g.*, Decl. Barwell Ex. 3, ECF No. 66-1 (August 3,

2010 Report).) Mr. Broehl compared various Pace and Best product pairings. (*Id.*) According to

Mr. Broehl the Pace and Best products he compared were all "very similar" with many products

sharing identical features and/or characteristics. (*See id.* at 3–18.) Best also highlights the

testimony of Kelvin Pong. Mr. Pong worked for Pace Products from 2005 until 2010. (Pong

Dep. 47, 159, ECF No. 61.) Mr. Pong testifies that while he was with Pace Products the

company always used the exact same molds to manufacture Pace and Best products. (*Id.* at 155.)

---

[9] Mr. Wang avers that the one exception to this general course of practice was a table lamp. (Wang Dep. 10.)

Similarly, Ping Shuo Kuan, an employee of Pace Technology from 2002 until 2006, avers that, at least in 2006, Pace Technology was making Pace products using tooling that Best owned. (Kuan Decl. ¶ 17, ECF No. 75-1.)

Witnesses also compared five specific sets of products within deposition testimony. (*See* Decl. Barwell Exs. 4–10, ECF No. 66-1.) With regard to the first set of products, Mr. Pong testifies—based on date codes—that the Best product was manufactured in 2005 and the Pace product was manufactured in 2009. (Pong Dep. 202.) According to Richard Arndt, a molding expert that the Pace companies retained, the case and cover for these products appear to come from the same mold and "[a]ll other molded parts may have come from the same mold." (Arndt Dep. 34, ECF No. 56.) With regard to the second pairing of products, Mr. Pong avers that the Best version was manufactured in 2006 and that the Pace version was manufactured in 2009. (Pong Dep. 207–08.) Mr. Arndt testifies that the plastic parts of these products came from the same mold. (Arndt Dep. 39.) Comparison of the other sets of products yields similar results.[10] (*See, e.g.*, Pong Dep. 212–13; Arndt Dep. 31–33.) Best also submits evidence, through its product comparisons, that the Best and Pace products at times included identical instruction sheets and matching product numbers. (Pong Dep. 210, 260.)

### d. Remaining Payment Obligations

The parties did not renew the Supply Agreement beyond its initial year period. (Melbourne Haughton Dep. 68.) According to Alan Zimmer ("Zimmer"), the CFO of Pace Electronic, in December 2007—as the Supply Agreement was coming to an end—the Pace

---

[10] Pace Electronic does not dispute that expert testimony reflects that certain Best and Pace products were made from the same tooling. (Pls.' Mem. Opp'n 2nd Mot. Summ. J. 18, ECF No. 72.)

companies began discussing forming a new company, Pace Lites. (Zimmer Dep. 121–22. ECF
No. 52-5.) Zimmer avers that the Pace companies ultimately formed Pace Lights in January 2008.
(*Id.* at 122.)

The parties dispute what, if any, payment obligations remain under the Supply Agreement.
Zimmer contends that Best still owes Pace Electronic $893,734.90 for goods the Pace companies
delivered to Best. (Zimmer Decl. ¶ 7, ECF No. 64-5.) According to Zimmer, Best has not
returned any of the products for which it owes payment. (*Id.* at ¶ 8.) Additionally, Zimmer avers
that Best's total Supply Agreement purchase, $4,475,137.00, fall $2,524,863.00 short of the
$7,000,000.00 minimum purchase requirement that the Supply Agreement required. (*Id.* at
¶ 12–14.) Zimmer calculates lost profits and overhead, at 20.42% of the sales shortfall, as
$515,457.38 to Pace Electronic, Pace Technology, and Pace Products. (*Id.* at ¶ 15.) Pace
Technology concedes that it has retained custody and control over Best's tooling because of
Best's failure to make payments. (*See* Pls.' Mot. Summ. J. 40–41, ECF No. 64.)

Best, however, maintains that various goods the Pace companies delivered under the
Supply Agreement were defective. A series of emails from July 2007 reflect that Best had
problems with a shipment of Edgelit exit signs. (Decl. J. Katz Ex. C, ECF No. 94-5.) The emails
indicate, however, that the companies resolved this issue and Best received credit to its account
for its replacement costs and labor. (*See id.*) The record also includes other communications
between Best and Pace Electronic employees regarding defective products later in 2007 and into
2008. (*See, e.g.*, Decl. J. Katz Exs. B, D, ECF Nos. 94-4, 94-6, Case No. 2:08-cv-752.) For
example, on April 15, 2008, J. Katz sent Kehoe and Zimmer a follow-up email referencing a
previous conversation. (Decl. J. Katz Ex. B.) Within the email, J. Katz stated that Best had

14

received defective products; had incurred labor bills based on replacement of defective products; and had quarantined Pace products due to defects. (*Id.*) Finally, during his deposition Zimmer testified that in 2010 he visited Best facilities to inspect allegedly defective products on behalf of the Pace companies. (Zimmer Dep. 36–38.) Zimmer testified that his inspection did reveal some defective Pace products that the Pace companies manufactured for Best, specifically ballasts. (*Id.* at 38–39.)

**B.     Procedural History**

Pace Electronic brought the initial action in this Court, Case No. 2:08-cv-752, in August 2008, seeking damages based on Best's failure to pay for goods the Pace companies delivered as well Best's failure to meet the minimum purchase requirement within the Supply Agreement. In August 2010, Pace Electronic, along with Pace Technology, brought a second action against Best in the Franklin County (Ohio) Court of Common Pleas, alleging misappropriation of trade secrets and tortious interference with contract based on Best's hiring of Pace employees. Best removed this case, which is now Case No. 2:10-cv-789, on the grounds of diversity jurisdiction. On May 2, 2011, the Court consolidated the two cases. Best asserts several counterclaims against Pace Electronic, Pace Technology, and F. Patrick Kehoe,[11] including breach of contract, breach of warranty, tortious interference with business relationships, misappropriation of trade secrets, violations of the Lanham Act, patent infringement, conversion, and fraud.

As detailed above, this matter is currently before the Court for consideration of the parties' various Motions for Summary Judgment. Best has filed two Motions for Partial Summary

---

[11] On October 22, 2012, the Court substituted the Estate of Frank Patrick Kehoe for F. Patrick Kehoe.

Judgment.  Within its first Motion, Best maintains that it is entitled to judgment on its

counterclaim that Plaintiffs breached the non-compete provision within the 2007 Supply

Agreement prohibiting the Pace companies from selling emergency lighting products in North

America.  Within its second Motion, Best contends that it is entitled to judgment on its breach of

contract counterclaim for violation of the Supply Agreement provision assigning

design/intellectual property to Best and prohibiting the Pace companies from using Best's tooling.

Pace Electronic and Pace Technology have also filed a Motion for Summary, requesting

various forms of relief.  First, both Plaintiffs move for voluntary dismissal of their Complaint in

Case No. 2:10-cv-789.[12]  Second, Pace Electronic moves for judgment on its Amended Complaint

in Case No. 2:08-cv-752.  Finally, Pace Electronic, Pace Technology, and Counter-Defendant

Kehoe move for summary judgment dismissing Best's counterclaims.

In July 2012, after they had filed their Motion for Summary Judgment, Pace Electronics,

Pace Technology, and Kehoe moved to amend their Answer to Best's Counterclaims to assert

additional affirmative defenses.  The Court granted leave to amend over Best's opposition, but

allowed Best to file a supplemental memorandum contra the motion for summary judgment.[13]

Best did not file a supplemental memorandum.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to

---

[12] Pace Technology was not a party to the Case No. 2:08-cv-752.

[13] Best maintains that Plaintiffs and Kehoe waived various affirmative defenses based on
failure to plead.  For the reasons state within the Court's September 11, 2012 Order, however, the
Court permitted Plaintiffs and Kehoe to amend their pleadings to add affirmative defenses.
Because the Court granted the Motion to Amend, the Court finds that Plaintiffs and Kehoe have
not waived such defenses.

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court may therefore grant a motion for summary judgment if the nonmoving party who has

the burden of proof at trial fails to make a showing sufficient to establish the existence of an

element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion . . . ." *Id.* at 323. The burden then shifts to the

nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine

issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; s*ee also Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine"

means that there must be more than "some metaphysical doubt as to the material facts").

Consequently, the central issue is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of

law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

### III. ANALYSIS

#### A.    Preliminary Matters

Before considering the various substantive issues the parties raise regarding summary

judgment, the Court will address two preliminary matters. First, the Court will consider

Plaintiffs' request for voluntary dismissal of their Complaint in Case No. 2:10-cv-789. Second,

17

the Court will address Best's request to exclude the Declaration of James J. Hooley ("Hooley Declaration"), which Pace Electronic and Pace Technology attached to their responsive briefing. (*See* ECF No. 72-1.)

### 1.     Voluntary Dismissal

Pace Electronic and Pace Technology request dismissal of their Complaint in Case No. 2:10-cv-789—which sets forth claims for misappropriation of trade secrets and tortious interference with contract based on Best's hiring of Pace employees—pursuant to Federal Rule of Civil Procedure 41(a)(2).[14]  Plaintiffs maintain that although they still believe Best improperly targeted Pace Technology employees, they seek to dismiss the cause of action due to the practical difficulties and expense of bringing such claims.  Best does not oppose dismissal, but seeks to maintain all of its counterclaims against both Plaintiffs and requests that the Court award attorney fees and costs to Best.  Pace Electronic and Pace Technology oppose an award of costs, asserting that they had a good faith basis for bringing the relevant claims.

Rule 41(a)(2) provides in pertinent part:

> [A]n action may be dismissed at the plaintiff's request [] by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed. R. Civ. P. 41(a)(2).  Determinations regarding a Rule 41(a)(2) motion are within the Court's broad discretion.  *See Commodities Export Co. v. Detroit Intern. Bridge Co.*, 695 F.3d 518, 530

---

[14]  The parties do not explicitly address whether such a dismissal should be with or without prejudice.  The language of Rule 41(a)(2), quoted below, applies the general presumption that such dismissals are without prejudice.

(6th Cir. 2012) (applying abuse of discretion).

"[T]he purpose of Rule 41(a)(2) is to protect the nonmovant . . . from unfair treatment." *Bridgeport Music, Inc. v. Universal-MCA Music Pub., Inc.*, 583 F.3d 948, 953 (6th Cir. 2009). "The mere prospect of having to face a second lawsuit" is not the type of prejudice that Rule 41(a)(2) addresses. *Jones v. W. Reserve Transit Auth.*, 455 F. App'x 640, 643 (6th Cir. 2012). Rather, in considering whether voluntary dismissal would result in "plain legal prejudice" the Court "consider[s] the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary judgment has been filed by the defendant." *Bridgeport*, 583 F.3d at 953 (internal quotations omitted).

Under Rule 41(a)(2), the Court may impose conditions on dismissal such as "the payment of costs incurred by a defendant." *Id.* at 954. The United States Court of Appeals for the Sixth Circuit, however, "has expressly rejected the contention that the payment of defense costs is universally required for voluntary dismissal under Rule 41(a)(2)." *Id.*; *see also Waldman v. Pitcher*, No. 1:10–cv–238, 2011 WL 4337046, at *2 (S.D. Ohio 2011) (" Rule 41(a)(2) is not a fee-shifting statute such that attorney fees are automatically awarded.") (internal quotations omitted) (Report and Recommendation later adopted). Relevant factors in determining whether to award costs and attorney fees include "whether a plaintiff acted in good faith in bringing the suit . . . and whether costs were wasted . . . ." *Ferron v. 411 Web Directory*, No. 2:09–cv–153, 2010 WL 2998607, at *4 (S.D. Ohio July 28, 2010). Moreover, a separate way to avoid waste is to allow the nonmovant to use evidence obtained in discovery in any subsequent action. *Id.* at *5.

In this case, the Court will allow for dismissal without prejudice. The Court

acknowledges that Plaintiffs' request for voluntary dismissal comes at a late stage in this action.

Moreover, the Court does not doubt that Best has incurred defense costs relating to Plaintiffs'

claims.  At the same time, however, Best has not filed a motion for summary judgment on these

claims and Plaintiffs should not be discouraged from engaging in a cost-benefit analysis as to

continuing litigation. *See Bridgeport*, 583 F.3d at 954 ("It would be speculative to conclude that

defendants would have prevailed on a motion for summary judgment when no motion for

summary judgment was pending, and plaintiffs had-at the district court's urging-weighed the costs

and benefits of continuing to litigate these cases.").

Moreover, the Court will not require Plaintiffs to pay Best's defense costs and attorney

fees as a condition to voluntary dismissal.  Best seeks costs and attorney fees maintaining that

Plaintiffs' Complaint in Case No. 2:10-cv-789 is frivolous.  The current record, however, does not

reflect that the Pace Companies brought the second action in bad faith.  Moreover, the Court is not

convinced, and Best has failed to demonstrate, that the filing of the second action was a

purposeful maneuver to delay the initial case.  Rather, the record evidence suggests that the Pace

Companies had some basis to believe that Best engaged in misconduct through the hiring of Pace

Technology employees.  (*See* Kehoe Dep. 140; Hull Decl. ¶¶ 1–2, ECF No. 77.)  At most, Best's

contentions raise only a speculative suspicion regarding improper motives.  Notably, as described

further below, Best has also decided in light of discovery not to pursue some of its claims.

Accordingly, under the circumstances of this case, Plaintiffs' Complaint in Case No. 2:10-

cv-789 is **DISMISSED** without prejudice subject to two conditions.  First, as the language of

Rule 41(a)(2) requires, Best's counterclaims against Pace Electronic and Pace Technology shall

remain pending for independent adjudication.  Second, the parties may use any discovery

20

materials in any subsequent action.

### 2. Hooley Declaration

The Court next addresses the Hooley Declaration. Plaintiffs attached the Hooley Declaration to their Memorandum in Opposition to Best's Second Motion for Partial Summary Judgment, which they filed on July 9, 2012. Mr. Hooley avers to being a specialist in emergency and exit lighting, having worked in the industry since the 1960s. (Hooley Decl. ¶¶ 1–2, ECF No. 72-1.) Mr. Hooley states that he has personal knowledge of emergency lighting and exit products marketed in the United States since 1969. (*Id.* at ¶ 5.) Based on his review of Best products, and his personal knowledge of the field, Hooley describes the originality of various Best products. (*See* Hooley Decl. ¶¶ 13–28.)

Best indicates that it was unaware that Plaintiffs would be offering testimony from Mr. Hooley until July 6, 2012, three days prior to the filing of Plaintiffs' responsive briefing. Best specifically provides a letter from opposing counsel, stating, "[e]nclosed, and being served upon you, please find Plaintiff's Supplement to Initial Disclosures identifying a newly discovered fact witness with personal information regarding the development and origination of emergency lighting products and illuminated exit signs." (Def.'s Reply 2nd Mot. Summ. J. Ex. A, ECF No. 79-1.) Best maintains that Plaintiffs failed to disclose Mr. Hooley during discovery despite requests from Best that they identify all witnesses. The discovery deadline in this case was March 16, 2012. (*See* ECF No. 43.) Furthermore, primary expert reports were due on September 23, 2011, with rebuttal expert reports due on November 23, 2011. (*See* ECF No. 38.)

In light of these circumstances, Best moves to strike Plaintiffs' Memorandum in Opposition to Best's Second Motion for Partial Summary Judgment (ECF No. 72) in its entirety.

In the alternative, Best requests that the Court strike the Hooley Declaration. Additionally, Best contends that the Court should not allow Mr. Hooley to provide any further testimony in this action. Finally, Best asserts that the Court should consider holding Plaintiffs in contempt for violating the Court's schedule. Plaintiffs have not responded to Best's objections to the Hooley Declaration.[15]

> Federal Rule of Civil Procedure 37(c)(1) states:
>
> Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
>> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>>
>> (B) may inform the jury of the party's failure; and
>>
>> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).

In this case, Rule 37(c)(1) applies. The record reflects that Plaintiffs failed to identify Mr. Hooley in a timely fashion in light of the Court's scheduling order. Moreover, Plaintiffs have failed to provide any substantial justification for their delay. Because of the timing of events, it is clear that allowing Mr. Hooley's testimony would unduly delay the now closed discovery and prejudice Best. Finally, although Mr. Hooley appears to have some personal knowledge of Best products, the value of his testimony appears to be his expertise in the emergency lighting field and

---

[15] Because Plaintiffs submitted the Hooley Declaration within their responsive briefing, Best raised its opposition to the Declaration within its Reply. Despite Best's allegations, however, Plaintiffs made no attempt to offer any form of sur-reply.

his ability to opine as to whether Best products are copies of pre-existing products.[16]

Under these circumstances, the Court will not consider the Hooley Declaration in resolving the current Motions for Summary Judgment. The Clerk is **DIRECTED** to **STRIKE** the Declaration (ECF No. 72-1) from the record. The Court finds it unnecessary, however, to strike Plaintiffs' responsive briefing in its entirety as much of the briefing deals with matters independent from the Hooley Declaration. Having stricken the Affidavit, the Court finds no need for sanctions.

**B.      Best's First Breach of Contract Claim—Non-Compete Provision**

The Court next addresses Best's first Motion for Summary Judgment contending that the Pace companies breached the Supply Agreement by selling emergency lighting and exiting products to non-approved companies within North America. Pace Electronic and Pace Technology also move for summary judgment as to this claim. At issue in this claim is the interpretation of the following provision of the Supply Agreement:

> During the term of the agreement, Pace shall not sell emergency lights or exit signs nor ballasts, nor solicit sales of these items to any party in North America without Best's prior written consent. Such sales, if approved by Best, shall be subject to a commission to be paid by Pace to Best. Penalties for violation of the non-compete provision shall be paid by Pace to Best at the rate of $500,000 per occurrence.

(Supp. Agr. 2.) The parties dispute centers around how to interpret the timing of the Pace companies' sales to various non-approved customers. Additionally, the parties disagree as to whether the damage provision of "$500,000 per occurrence" is enforceable. Finally, Plaintiffs also maintain that the Pace companies breached the Supply Agreement through other methods of

---

[16]  To the extent Plaintiffs seek to offer Hooley as a fact witness, Plaintiffs may move to list him as an additional witness, although the Court expressly reserves any decision on such a motion until both parties have an opportunity to address the issue.

competition.

### 1.    Applicable Law

As noted above, the parties bring this action, including their various breach of contract

claims, based on diversity. "A court sitting in diversity applies the law of the forum state and, in

the absence of direct state court precedent, must make its best prediction as to how the highest

state court would resolve the issues presented." *Travelers Prop. Cas. Co. of Am. v. Hillerich &*

*Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010). Furthermore, in this case, the Supply

Agreement explicitly incorporates Ohio law. (Supp. Agr. 3.)

Under Ohio law, "the elements for a breach of contract are that a plaintiff must

demonstrate by a preponderance of the evidence that (1) a contract existed, (2) the plaintiff

fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted

from this failure." *Anzalaco v. Graber*, 970 N.E.2d 1143, 1148 (Ohio Ct. App. 2012). In

interpreting contractual language, the Court's purpose "is to ascertain and give effect to the intent

of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*,

78 Ohio St.3d 353, 361 (Ohio 1997). The Court generally presumes that the intent of the parties

rests within the language of the contract. *Id.* "Common words appearing in a written instrument

will be given their ordinary meaning unless manifest absurdity results, or unless some other

meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* (internal

quotations omitted).

"[T]he interpretation of written contract terms, including the determination of whether

those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v.*

*Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law). "[I]n cases where

ambiguity exists, interpretation of the parties' intent is a question to be determined by the trier of fact." *Schafer v. Soderberg & Schafer*, 196 Ohio App.3d 458, 477, (Ohio Ct. App. 2011) (internal quotations omitted); *see also PNC Bank, N.A. v. May*, No. 98071, 2012 WL 4243807, at *2 (Ohio Ct. App. Sept. 20, 2012) ("If . . . the contract is ambiguous, ascertaining the parties' intent constitutes a question of fact that may require the consideration of parol evidence.").

"Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 414 (Ohio Ct. App. 2003) (internal quotations omitted). Generally, "[u]nder the parol-evidence rule, if a contract is unambiguous, a court may not use extrinsic evidence to interpret the agreement." *Lindsley v. Roe*, 196 Ohio App. 3d 596, 604 (Ohio Ct. App. 2011). The Ohio Uniform Commercial Code ("UCC"), applicable to the sale of goods, does allow for the use of certain types of extrinsic evidence, such as course of performance, to "explain[] or supplement[]" a written agreement.[17] Ohio Rev. Code § 1302.05.

"[W]here a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent."[18] *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (Ohio 2003). "Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the

---

[17] This Court has held that, under Ohio law, distribution agreements, such as the one involved in this case, are sales contracts. *See Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899, 907 (S.D. Ohio 2009) (collecting case law). The Ohio UCC explicitly provides, however, that general "principles of law and equity" supplement the UCC unless a particular UCC provision displaces such principles. Ohio Rev. Code § 1301.103(B).

[18] The Court, however, may not use extrinsic evidence "to alter a lawful contract by imputing an intent contrary to that expressed by the parties." *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (Ohio 2003).

contract, and (3) any acts by the parties that demonstrate the construction they gave to their

agreement." *Covington*, 151 Ohio App. 3d at 414. Although the resolution of any ambiguity is a

question of fact, if extrinsic evidence reveals only one reasonable interpretation, the Court may

enter summary judgment. *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No.

07–CV–01190, 2011 WL 5520954, at *5 (S.D. Ohio Nov. 14, 2011) (applying Ohio law).

### 2.     Liability as to the Non-Compete Provision

The facts surrounding the Supply Agreement's non-compete provision are largely

undisputed. Best contends—and Plaintiffs do not contest—that the Pace companies shipped,

invoiced, and received at least some payment for emergency lighting and exit products to non-

approved companies during the life of the Supply Agreement. The Pace companies assert,

however, that they made all of the relevant shipments pursuant to purchase orders that they

entered into prior to the effective date of the Supply Agreement.[19]  In light of these circumstances,

the parties propose different interpretations of the Supply Agreement's prohibitions on selling and

soliciting sales. Best maintains that the Court should consider the shipment, and receipt, of goods

to constitute sales within the meaning of the Supply Agreement. The Pace companies, on the

other hand, contend that the Supply Agreement provision was not designed to impact pending

purchase orders, but was instead created to restrict the companies' ability to enter into new sales

contracts.

Based on the language of the Supply Agreement, the Court finds that the terms in question

are ambiguous. First, as Best maintains, it is reasonable to interpret the timing of a sale, for the

---

[19]  The Court finds that the Pace companies have directed the Court to sufficient evidence,
referenced above, to create a genuine issue of material fact as to this issue.

purposes of the Supply Agreement's non-compete provision, as applying to the actual time of shipment and receipt of the products in question. After all, a sale is commonly defined with reference to the transfer of the items in question. For example, the Ohio UCC defines sale, for the purposes of its various provisions, as "consisting in the passing of title from the seller to the buyer for a price." Ohio Rev. Code § 1302.01(A)(11). The UCC further distinguishes sale from a "contract for sale" which can "include[] both a present sale of goods and a contract to sell goods at a future time." *Id.* Best's interpretation is also consistent with the Supply Agreement as a whole. Most notably, under Schedule B of the Supply Agreement, Best permitted the Pace companies to sell to certain companies, suggesting the exclusion of other companies regardless of the nature of previous business relationships.[20] (*See* Supp. Agr. 11.)

The Court also finds, however, that the Pace companies proposed interpretation of the Supply Agreement is reasonable. To begin with, the terms "sell" and "solicit sales" are relatively imprecise, naturally lending themselves to more than one possible meaning. The Supply Agreement does not offer any definition of these terms. Under such circumstances, it is reasonable to read the Supply Agreement as prohibiting new sales arrangements, or the solicitation of new sales, as opposed to the completion of prior sales agreements. Such an approach can also be reconciled with Schedule B of the Supply Agreement. As Plaintiffs highlight, Schedule B did not simply allow the Pace affiliates to complete pre-existing sales

---

[20] Moreover, as Best stresses, the Supply Agreement stated that "Pace shall disclose to Best all emergency lighting/exit/ballast product shipments by customer including selling price and terms made by Pace to all customers in North America for the last two years." (Supp. Agr. 2.) This language technically only applies to shipments for the last two years, as opposed to pending shipments. Nevertheless, this language does support the notion that, in forming the Supply Agreement, the parties required the Pace companies to account for their pre-existing business relationships.

agreements. Rather, Schedule B allowed the Pace companies to actively sell to the listed customers throughout the effective period of the Supply Agreement.

Considering extrinsic evidence, in light of the Supply Agreement's ambiguity, a genuine issue of fact remains as to the intent of the parties. In light of the evidence, including the parties' circumstances at the time of contracting, a reasonable jury could reach alternative conclusions regarding the intent of the parties  On the one hand, the evidence indicates that, in forming the Supply Agreement, Best officials strongly distrusted the Pace companies and, therefore, required a restrictive non-compete provision applying to any activities associated with the selling of products. Moreover, from the evidence a reasonable jury could infer that Best was unaware of the Pace companies pre-existing contracts with the four non-approved companies, and that the Pace companies made an independent decision to enter into the Supply Agreement knowing that its terms conflicted with pre-existing purchase orders.

On the other hand, a reasonable jury could also infer that the parties did not intend for the Supply Agreement's non-compete provision to interfere with the Pace companies' pre-existing purchase orders. Most obviously, because the evidence reflects that the Pace companies had purchase orders with non-approved customers prior to the Supply Agreements effective date, a reasonable jury could conclude that Plaintiffs had no intention of entering an agreement that would force them to breach various other contracts. Moreover, if it found Kehoe credible, the trier of fact could also conclude that Best had at least some knowledge of the Pace companies' pending order at the time of contracting. (*See* Kehoe Dep. 104–06.)

Because there is an issue of fact regarding the intent of the parties with regard to the non-compete agreement, the Court cannot determine, as a matter of law, whether the Pace companies

28

2007 actions violated the Supply Agreement's non-compete provision. Accordingly, neither party is entitled to summary judgment as to this claim.

### 3.    Penalty Provision

In addition to liability, the parties also dispute whether the damages provision embedded within the Supply Agreement's non-compete provision is enforceable. The final sentence of the non-compete provision stated that "[p]enalties for violation of the non-compete provision shall be paid by Pace to Best at the rate of $500,000 per occurrence." (Supp. Agr. 2.) Best contends that this is an enforceable liquidated damages provision designed to protect the "immeasurable loss" Best would suffer from the Pace companies competing for its customers. Plaintiffs on the other hand, assert that this provision is an unenforceable penalty disproportionate to the amount of damages Best actually suffered.

Under Ohio law, although parties are generally free to enter into contracts with damage provisions, "complete freedom of contract is not permitted for public policy reasons." *Lake Ridge Academy v. Carney*, 66 Ohio St. 3d 376, 381 (Ohio 1993). "Penalty provisions in contracts are invalid on public policy grounds because a penalty attempts to coerce compliance with the contract rather than represent damages which may actually result from the failure to perform." *Heskett Ins. Agency, Inc. v. Braunlin*, No. 11CA3234, 2011 WL 5903484, at *6 (Ohio Ct. App. Nov. 16, 2011). On the other hand, Ohio law allows liquidated damages provisions "as long as the provision does not disregard the principle of compensation." *Lake Ridge*, 66 Ohio St. 3d at 381 (internal quotations omitted).

Ohio courts generally apply the following three part analysis to distinguish between penalty and liquidated damage provisions:

29

> Where the parties have agreed on the amount of damages, ascertained by estimation
> and adjustment, and have expressed this agreement in clear and unambiguous terms,
> the amounts so fixed should be treated as liquidated damages and not as a penalty,
> if the damages would be (1) uncertain as to amount and difficult of proof, and if (2)
> the contract as a whole is not so manifestly unconscionable, unreasonable, and
> disproportionate in amount as to justify the conclusion that it does not express the
> true intention of the parties, and if (3) the contract is consistent with the conclusion
> that it was the intention of the parties that damages in the amount stated should
> follow the breach thereof.

*Kurt v. W. Property, L.L.C.*, No. 10AP–1099, 2011 WL 6916196, at *6 (Ohio Ct. App. Dec. 27,

2011) (quoting *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St. 3d 27, 27 (Ohio 1984)). The

Ohio UCC explains the distinction as follows:

> Damages for breach by either party may be liquidated in the agreement but only at
> an amount which is reasonable in the light of the anticipated or actual harm caused
> by the breach, the difficulties of proof of loss, and the inconvenience or
> non-feasibility of otherwise obtaining an adequate remedy. A term fixing
> unreasonably large liquidated damages is void as a penalty.

Ohio Rev. Code § 1302.92.

"The issue of whether a contract clause provides for liquidated damages or an

unenforceable penalty presents a question of law . . . ." *Heskett Ins. Agency, Inc. v. Braunlin*, No.

11CA3234, 2011 WL 5903484, at *6 (Ohio Ct. App. Nov. 16, 2011). The Court, however,

"must step back and examine [the stipulated damages provision] in light of what the parties knew

at the time the contract was formed and in light of an estimate of the actual damages caused by

the breach." *Lake Ridge*, 66 Ohio St. 3d at 382.

At least some courts have suggested that the burden is initially on the party seeking

liquidated damages to prove that such a clause is enforceable. *See Hitachi Medical Systems*

*America, Inc. v. Choe*, No. 5:10CV384, 2012 WL 4475496, at *5 (N.D. Ohio Sept. 26, 2012)

(finding that Ohio law place an initial threshold burden on a party seeking liquidated damages to

satisfy "the estimation and adjustment requirement" within the *Samson Sales* test); *Tremco Inc.*

*v. Kent*, No. 70920, 1997 WL 284744, at *9 (Ohio Ct. App. 1997) (noting that some Ohio courts

have indicated "that the party seeking to enforce the stipulated damages provision demonstrate

that the three prongs of the [*Samson Sales*] test are satisfied). Nevertheless, courts have also

considered opposition to such damage provision to be an affirmative defense, placing the burden

on the defendant.[21] *Tremco*, 1997 WL 284744, at *9.

 Upon review, the Court finds that the " $500,000 per occurrence" clause of the Supply

Agreement is an unenforceable penalty.[22] Even assuming that damages from the Pace

companies' sales to North American customers was sufficiently difficult to calculate at the time

of contracting,[23] the record reflects that $500,000 was not a reasonable estimate of the damages

Best would suffer per sales occurrence. Best has produced evidence indicating that, at the time

of the formation of the Supply Agreement, the Pace companies were conducting business with

other North American customers. Nevertheless, nothing in the record suggests that the Pace

companies were selling at a high enough volume that Best would incur $500,000 worth of

---

[21] For the reasons described below, regardless of which party bears the burden, the Court finds that the damages provision at issue is an unenforceable penalty.

[22] Notably, although it is not a significant factor in the Court's analysis, the Supply Agreement explicitly labels the clause as a penalty for violation of the non-compete provision.

[23] Best contends that the damages provision was intended to account for the immeasurable loss to Best resulting from the Pace companies competing with Best for customers in North America. Although perhaps difficult to prove, the Court does not find that Best's losses are immeasurable. The Supply Agreement prohibited the Pace companies from selling to customers in North America during its one-year effective period. Each sale violating this provision provides a concrete transaction from which Best's damages, at the very least, can be estimated. *Cf. Welch v. K-Beck Furniture Mart, Inc.*, 3 Ohio App.3d 171, 173 (Ohio Ct. App. 1981) (holding, in the context of Ohio Revised Code § 1302.92(A), " it seems certain that a reasonably accurate estimate of damages for a lost sale could be calculated").

damages for every competing sale that the Pace companies completed.  Albeit hindsight

information, it is noteworthy that the thirteen transactions in question that purportedly violated

the Supply Agreement only reached a total sales price of approximately $250,000.  Instead of

reflecting the amount of damages that it would suffer, Best appears to concede that the parties

intended the $500,000 damage amount to be a "draconian provision" to "punish non-

performance" and deter the Pace companies from selling products in North America.  (Def.'s

Reply 1st Mot. Summ. J. 8, ECF No. 78.)  Such a purpose is not permissible under a breach of

contract theory.

   The Court also finds the remainder of Best's contentions in favor of the damage provision

unconvincing.  The fact that sophisticated parties negotiated the penalty provision is not enough

to make it enforceable.  *Cf. Lake Ridge*, 66 Ohio St. 3d at 382 (holding that "the parties' actual

intention as to [a damage provision's] validity" is not significant in determining whether such a

provision is valid) (internal quotations omitted).  Moreover, Best cannot utilize a breach of

contract theory to punish, and apply punitive damages to, the Pace companies for tort-like

behavior.  *See id.* at 381 (explaining why contractual law does not allow for punitive remedies).

### 4.    Related Breach of Contract Claims

   Within its first counterclaim for breach of contract, Best also asserts claims for breach of

contract based on other methods of competition.[24]  In particular, Best maintains that Plaintiffs

breached the Supply Agreement by "undercutting prices" to customers to whom they were able to

directly sell under Schedule B of the Supply Agreement.  (Am. Counterclaim ¶ 33(b), ECF No.

---

[24] Best also counterclaims breach of contract on other unrelated grounds, such as use of
Best's tooling.  The Court will address these counterclaims below.

27.)  Additionally, Best alleges that Plaintiffs breached the Supply Agreement by establishing

business entities and "procuring a warehouse and distribution center" for the purpose of selling

competing emergency lighting products.  (*Id.* at ¶ 33(c).)  The Pace companies move for

summary judgment to the extent Best asserts breach of contract on these two grounds.[25]  They

specifically maintain that the activities Best alleges do not breach the terms of the Supply

Agreement.

    Upon review of the Supply Agreement, the Court agrees that Plaintiffs are entitled to

judgment as a matter of law to the extent Best bases its breach of contract claims on the

undercutting of prices and the establishment of a business.  First, under the Supply Agreement

the only companies that the Pace companies were able to directly sell to were Lithonia Lighting

and Chloride Systems.  (Supp. Agr. 11.)  The Supply Agreement, and more specifically Schedule

B, did not place any limitations on the Pace companies ability to set product prices to these

customers.  Accordingly, even assuming that the Pace companies were undercutting Best's

prices, such action would not constitute a breach.

    The Court reaches a similar conclusion as to Best's claims based on the establishment of

a separate business and procurement of facilities.  The Supply Agreement prohibited the Pace

companies from selling emergency lighting products, and soliciting such sales, during the course

of the agreement.  The Supply Agreement, however, did not prohibit the Pace companies from

developing, and taking action toward, a business plan for after the effective date of the Supply

---

[25]  Best appears to maintain that Plaintiffs have not moved for summary judgment as to
these allegations of breach of contract.  (*See* Def.'s Mem. Opp'n 33, 43, ECF No. 75.)  The Court
disagrees.  Although their briefing on these issues is concise, the Pace companies clearly
maintain that neither the undercutting of prices nor the establishment of a business violate the
Supply Agreement.

Agreement.  If the Pace companies had established a separate business, and that business had

sold competing products during the effective period of the Supply Agreement, such actions

would likely constitute breach.  Best fails to demonstrate, or even allege, that such sales took

place.  Accordingly, the Pace companies are entitled to judgment as a matter of law as to this

aspect of Best's breach of contract claim.

**C.    Best's Second Breach of Contract Claim—Use of Tooling and Assignment of Rights**

Within its first and seventh counterclaims, Best alleges that Plaintiffs violated the

assignment provision of the Supply Agreement.  As detailed above, the provision provided:

> Pace shall not use any tooling owned by Best other than for the manufacturer of
> products for sale to Best, and assigns to Best all designs and intellectual property
> (and all derivations thereof) for products developed or to be developed at or by Pace
> for Best.

(Supp. Agr. 2.)  Best contends that it is entitled to summary judgment because Plaintiffs violated

this provision in two separate ways.[26]  First, Best maintains that the Pace companies violated the

assignment of designs and intellectual property by copying Best's products.  Second, Best asserts

that the Pace companies used Best's tooling to produce Pace products.[27]

**1.    Assignment of Designs**

In light of the evidence before the Court, and the terms of the Supply Agreement, the

Court finds that there is a genuine dispute of fact as to whether the Pace companies violated the

---

[26]  Plaintiffs do not move for summary judgment as to this claim.  In moving for summary
judgment on this breach of contract claim, Best speculates that it "could have moved" for
summary judgment on its Lanham Act claims as well.  (Def.'s 2nd Mot. Summ. J. 24, ECF No.
66.)  The Court, however, will not speculate as to matters that Best could have raised, and will
only consider the breach of contract claim that Best chose to actually bring before the Court.

[27]  In interpreting the assignment provision of the Supply Agreement the Court will apply
the general principles of contract interpretation outlined earlier in this Opinion and Order.

Supply Agreement. Best essentially contends that because the Pace companies produced the same products for themselves that they produced for Best, the Pace companies automatically violated the assignment provision. The language of the assignment provision, however, is not this broad. Specifically, the assignment provision extends to "*designs and intellectual property* . . . for products developed or to be developed at or by Pace for Best." (Supp. Agr. 2 (emphasis added).) The plain meaning of the term "design," especially when read in concert with "intellectual property," connotes at least some level of creativity, originality, or inventiveness, as opposed to the copying of an already existing product. Accordingly, to the extent the Pace companies—in making both Best and Pace products—simply copied pre-existing readily available products, there were no applicable designs or intellectual property.

In this case, a reasonable jury could find that the Pace companies manufacturing of Pace products did not violate the assignment provision. Specifically, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that, in manufacturing Best and Pace products, the Pace companies were merely copying products available on the market and not relying on any designs or intellectual property. During his deposition, Kehoe stated that all of the products in question were "existing jelly bean products" and did not consist of any "novel designs . . . ." (Kehoe Dep. 127.) Kehoe further testified that the tooling the Pace companies used to manufacture emergency lighting products was "based upon garden variety samples that [the Pace companies] got from the marketplace." (*Id.* at 89.) Relatedly, the record reflects conflicting testimony between the opinions of the experts as to the originality or uniqueness of

35

Best products.[28]  Although Best submits competing testimony from Mr. Broehl, Paul J. Klock—a

Pace-retained expert—testifies that all of the Best products he reviewed were generic and lacked

proprietary design.  (*See* Klock Dep. 18–20, 30–31, ECF No. 59.)  Ultimately, under these

circumstances, there remains a triable issue of fact as to whether the Pace companies violated the

assignment provision.

###### 2.    Use of Tooling

In addition to assigning design and intellectual property rights, the Supply Agreement

also prohibited the Pace companies from using any tooling "owned by Best other than for the

manufacturer of products for sale to Best."  (Supp. Agr. 2.)  Breaking down the language of this

clause, to establish that it is entitled to judgment for breach Best must demonstrate (1) that

Plaintiffs used tooling for purposes other than the manufacture of Best products; (2) that Best

owned the tooling in question; and (3) that the "use" occurred after the January 10, 2007

effective date of the Supply Agreement.  Best submits compelling evidence, in the form of expert

testimony and product comparisons, to demonstrate that the Pace companies made Best and Pace

products by using the same tooling.  Plaintiffs do not appear to dispute this point.  Plaintiffs,

however, maintain that there are issues of fact surrounding the ownership of tooling as well as

the date of the use of tooling.

The Court finds that genuine factual disputes remain barring the entry of summary

judgment.  First, there are disputes of fact concerning the ownership of the tooling in question.

In April 2005, through the "big wash" transaction, Best purchased tooling from the Pace

---

[28]  Once again, in reaching this conclusion the Court has not relied upon, or considered,
the Hooley Declaration.

companies. Based on the current record, however, the extent of this purchase is not clear. Best

appears to assume, based on general testimony from its own representatives and select Pace

employees, that through the "big wash" it owns all of the tooling at issue. (*See, e.g.*, Wang Dep.

67.) According to Kehoe, however, the Pace companies made many of the products they

manufactured for Best with the Pace companies' own tooling. (*See* Kehoe Dep. 77-83.)

Moreover, a March 2005 tooling charge list suggests that the big wash only involved payment on

select pieces of tooling. (*See* Hull Decl. Ex. B.)  Finally, Kehoe also testified that the tooling

wore out and that the Pace companies replaced such tooling at their own cost.[29]  (Kehoe Dep.

87.)

Additionally, there are questions of fact surrounding the time frame of events. Once

again, to demonstrate a breach of the Supply Agreement, Best must show that the Pace

companies used Best's tooling after January 10, 2007.  In comparing five sets of products, Best

relies heavily on Mr. Pong's testimony concerning product date codes to demonstrate that Pace

companies made various Pace products after 2007. (*See, e.g.*, Pong Dep. 202.)  The testimony of

Mr. Wang, however, indicates that the date codes do not reflect when components of a product

were molded, but instead reflect when the product was assembled and tested.  (Wang Dep. 72.)

According to Wang, molded parts could sit for as long as five years before testing. (*Id.* at

_____

[29]  Best contends that to replace tooling, the Pace companies would have had to "use" the
original tooling Best owned.  The evidence before the Court, however, does not conclusively
demonstrate the method the Pace companies employed to make replacement tooling. As detailed
above, there is at least some testimony that the Pace companies made tooling based on sample
products.  Moreover, even assuming that the Pace companies used original tooling to make
replacement tooling, the evidence does not establish whether the Pace companies made the
relevant replacement tooling after April 2005, but before the effective date of the Supply
Agreement.

73–74.)

In considering the use of tooling, the Court recognizes that Kehoe's deposition testimony cuts in both directions. On the whole, Kehoe's testimony regarding the use of tooling is often unclear, especially with regard to timing. (*See generally* Kehoe Dep. 70–91.) At times, Kehoe does appear to concede that the Pace companies did use Best's tooling to manufacture their own products, at least to some degree. Kehoe specifically testified that the Pace companies produced some select products, specifically die casts, using tooling that Best owned. (*Id.* at 81, 90–91.) The deposition testimony, however, does not clearly establish when such production occurred. Kehoe also testified that such use occurred with Best's permission. Such permission presents another factual issue.[30] As Best stresses, however, such permission contradicts the language of the Supply Agreement, and, therefore, is not admissible to demonstrate the terms of the contract.

**D.     Pace Electronics First Breach of Contract Claim—Unpaid Goods**

Pace Electronics seeks summary judgment on its first breach of contract claim, maintaining that it is entitled $893,734.90 for goods that Best accepted. Relatedly, Plaintiffs move for summary judgment as to Best's counterclaims for offset based on breach of warranty claims. Best contends that there is a dispute of fact surrounding whether Pace Electronics is the actual holder of the debt. Additionally, Best maintains that there are factual disputes concerning whether Best is due offsets that preclude summary judgment as to Best's breach of warranty claims.

---

[30] Best contends that it never granted such permission. Nevertheless, for the purposes of summary judgment, the Court must credit Kehoe's testimony.

### 1.    Holder of Debt

To assess Pace Electronic's claim for payment on accepted goods, the Court must first address whether payment Best owes any due payment to Pace Electronic—as opposed to Pace Technology or Pace Products—under the terms of the Supply Agreement.

Upon review of the Supply Agreement, and the relevant extrinsic evidence, the Court finds that, to the extent that Best owes payment, such payment is due to Pace Electronic. Although the Supply Agreement does not explicitly provide which Pace affiliate Best must pay, it does state "Best shall issue purchase orders directly to Pace Electronics for Products . . . ." (Supp. Agr. 1.) Moreover, the parties' course of performance under the Supply Agreement demonstrates that Best's payments were due to Pace Electronic. Specifically, Zimmer avers that pursuant to the Supply Agreement Best submitted purchase orders to Pace Electronic; Pace Electronic then placed orders with Pace Technology and Pace Products, who shipped goods directly to Best Lighting; Pace Electronic issued invoices to Best; and Best remitted payments to Pace Electronic. (Zimmer Decl. ¶¶ 2–3, 5–6.) Additionally, Pace Electronic submits records documenting that Best submitted payments to Pace Electronic during the relevant period. (Hull Decl. Ex. A, ECF No. 77-1.)

Best has not submitted any evidence to contradict Pace Electronic's submissions regarding the parties' course of performance under the Supply Agreement. Instead, Best relies heavily on the fact that it also received invoices from Pace Products. Best has not provided any evidence, however, that it paid Pace Products directly under the Supply Agreement. Moreover, Zimmer explains within his Declaration that although Pace Products included invoices with each shipment "[f]or inventory control purposes," Best did not pay Pace Products directly. (Zimmer

Decl. ¶ 4.) Under these circumstances, and without further evidence to support Best's position, the Court finds that Best owes Pace Electronic any undue payment under the Supply Agreement.

### 2.    Breach of Warranty Claims

The extent of any payment due, however, is directly related to whether Best is entitled to an offset with regard to its breach of warranty claims.  Best specifically brings a breach of express warranty counterclaim.  The Supply Agreement specifically stated that "Pace shall warrant the goods as to quality and conformance with specifications; Pace shall bear all costs of replacement and rework of any Products proven to contain manufacturing defects . . . ."  (Supp. Agr. 2.)  Additionally, Best brings counterclaims for breach of the implied warranty of merchantability and the implied warranty of fitness for a particular purpose.  Plaintiffs maintain that they are entitled to summary judgment because Best failed to provide proper notice and identify defective goods under the Supply Agreement.

Under Ohio law, parties may create an express warranty through a promise that goods will conform to set standards.  Ohio Rev. Code § 1302.26.  Moreover, the Ohio UCC provides that, unless excluded, warranties of merchantability and fitness for a particular purpose are generally implied in sales for goods, at least between merchants.  *See* Ohio Rev. Code § 1302.27 (warranty of merchantability); Ohio Rev. Code § 1302.28 (fitness for particular purpose).  As one federal court has described, an Ohio law breach of warranty claim requires a plaintiff to establish: "(1) the existence of a warranty; (2) the product failed to perform as warranted; (3) the plaintiff provided the defendant with reasonable notice of the defect; and (4) the plaintiff suffered an injury as a result of the defect." *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 753 (N.D. Ohio 2010).

40

With regard to notice, the Ohio UCC specifically provides that "[w]here a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach . . . ." Ohio Rev. Code § 1302.65. Commentary to this section further states that "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." Ohio Rev. Code § 1302.65, Official Comment 4. "[T]he determination of a reasonable time and the adequacy of notice to the seller are ordinarily questions of fact." *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 51 (Ohio 1989) (internal quotations omitted). Moreover, "[a] trial court should be reluctant to grant summary judgment on the grounds that notice of breach was untimely as a matter of law." *Id.*

In this case, Pace Electronic and Pace Technology are not entitled to judgment as a matter of law as to Best's breach of warranty counterclaims. First, the existence of a warranty was clear, as Pace expressly warrantied conformance with specifications within the Supply Agreement. Second, the Court finds that factual issues remain concerning whether notice was timely and sufficient. The record evidence reflects that, at a minimum, J. Katz emailed Pace Electronic employees regarding defective products in April 2008. (Decl. J. Katz Ex. B.) This email implied that the parties had engaged in early conversations about the issue and specifically referenced at least one set of defective items (BAL 1400). (*Id.*) Construing the evidence in favor of Best, a reasonable jury could find that Best's notice of defect was timely and sufficiently specific to alert the Pace companies of problems with the transactions. Moreover, the evidence reflects a genuine dispute of fact regarding whether the products in question were defective. Tellingly, during his deposition, Zimmer testified that in inspecting some of the products in question he did observe

defective products that the Pace companies produced for Best. (Zimmer Dep. 38–39.) Finally, under the circumstances of this case, and the general timing of events, the trier of fact could reasonably infer that the Pace products in question were a part of purchase orders under the Supply Agreement.

Because there are disputed issues of fact surrounding Best's breach of warranty counterclaims, it is unclear what, if any, damages Best will be entitled to for any breach. *See* Ohio Rev. Code § 1302.88 (describing damages available for breach when goods are accepted). Consequently, the extent to which Best is entitled to offset against its remaining payment obligation to Pace Electronic cannot be determined until the claims for breach of warranty are resolved. Accordingly, Pace Electronic is not entitled to judgment as a matter of law as to the parties remaining payment obligations.

**E.      Pace Electronic's Second Breach of Contract Claim—Purchase Requirement**

Pace Electronic also moves for summary judgment, as to its second breach of contract claim, based on failure to meet the $7,000,000 minimum purchase requirement. Pace Electronic submits evidence—which Best does not contest—demonstrating that Pace Electronic only purchased $4,475,137.00 of product during the year term of the Supply Agreement. (Zimmer Decl. ¶ 13.) Pace Electronic seeks lost profits, on behalf of all three Pace affiliates, in the amount of $515,457.38. (*Id.* at ¶ 15.) Best, however, maintains that it was excused from performance as to the minimum purchase requirement based on the Pace companies' conduct. Specifically, Best contends that the Pace companies repudiated the Supply Agreement by unilaterally raising product prices. In the alternative, Best maintains that the Pace companies' conduct placed it under economic duress to accept the altered prices. Additionally, Best contends

42

that Pace Electronic fails to submit sufficient evidence of lost profits.

### 1.    Excuse of Performance

Under Ohio law, "the mere breach of a term of a contract committed by a party who has substantially performed its obligations under the contract does not relieve the other party from performance." *Hostetler v. Cent. Farm & Garden, Inc.*, No. 2010 AP 12 0046, 2012 WL 439696, at *6 (Ohio Ct. App. Feb. 9, 2012). Nevertheless, " [i]f a defendant fails to perform an essential or material element of a contract, not only can it be liable for damages, but it also excuses the plaintiff from any further performance." *Nious v. Griffin Constr., Inc.*, No. 03AP-980, 2004 WL 1752872, at *3 (Ohio Ct. App. Aug. 5, 2004); *see also Hanna v. Groom*, No. 07AP-502, 2008 WL 500530, at *5 (Ohio Ct. App. Feb. 26, 2008) ("'[I]t is hornbook law that when one party to a contract commits a material breach, the non-breacher has the option of either continuing the contract and suing for partial breach, or terminating the agreement in its entirety' . . . .") (quoting *Gem. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 315 n.5 (3rd Cir. 2001)).

"[A] material breach of contract is a party's failure to perform an element of the contract that is so fundamental to the contract that the single failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Creative Concrete v. D & G Pools*, No. 07 MA 163, 2008 WL 2609504, at *3 (Ohio Ct. App. June 26, 2008). Ohio courts generally consider five factors in determining whether a breach is material:

> [T]he extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party.

*Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App. 3d 163, 170–71 (Ohio Ct. App. 1990). Moreover, as one Ohio court has outlined:

> The determination of whether a party's breach of a contract was a "material breach" is generally a question of fact. *See Kersh v. Montgomery Developmental Center* (1987), 35 Ohio App.3d 61, 63, 519 N.E.2d 665. That has been the law for at least two decades, and it has been upheld by other courts. *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio* (S.D. Ohio 2006), 437 F.Supp.2d 706, 730-731; *Lewis & Michael Moving and Storage, Inc. v. Stofcheck Ambulance Serv., Inc.*, Franklin App. No. 05AP-662, 2006-Ohio-3810, at ¶ 20-22; see, also, Williston on Contracts (4th Ed.1990), Section 63:3; E. Allan Farnsworth, Contracts (1982), Sections 8.16-18, at 612. The reasoning behind this principle is that to determine whether a party's breach was material requires, inter alia, an examination of the parties' injuries, whether and how much the injured parties would or could have been compensated, and whether the parties acted in good faith. *Id.* All of these inquiries turn on subjective facts.

*O'Brien v. Ohio State Univ.*, No. 06AP-946, 2007 WL 2729077, at *3 (Ohio Ct. App. Sept. 20, 2007).

Similarly, the Ohio UCC provides that when a party repudiates a contract, an aggrieved party has the option to suspend its own performance under the contract. Ohio Rev. Code § 1302.68(C). "Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." Ohio Rev. Code § 1302.68, Official Comment 2.

Parties are generally free to seek the modification to the terms of an existing contract. *Cf.* Ohio Rev. Code § 1302.12(A) (indicating that under the Ohio UCC agreements to modify existing contracts are enforceable even in the absence of consideration). A party's unilateral change of contract terms, however, may constitute breach. *See Brakefire, Inc. v. Overbeck*, 144 Ohio Misc. 2d 35, 59 (Ohio Com. Pl. 2007) (concluding that an employer's unilateral change of an employee's compensation constituted a material breach of an employment contract). Relatedly, economic duress is a defense to contract terms. *Wright Safety Co. v. U.S. Bank, N.A.*,

No. 26052, 2012 WL 3517597, at *4 (Ohio Ct. App. Aug. 15, 2012).  To establish economic

duress a party must demonstrate (1) that it involuntarily accepted the terms of another; (2) that

under the circumstances it had no other reasonable alternative; and (3) that the circumstance were

a product of coercive actions on the part of the opposite party. *Blodgett v. Blodgett*, 49 Ohio

St.3d 243, 246 (Ohio 1990).  "Merely taking advantage of another's financial difficulty is not

duress.  Rather, the person alleging financial difficulty must allege that it was contributed to or

caused by the one accused of coercion." *DiFranco v. Razakis*, No. 94809, 2011 WL 1326216, at

*3 (Ohio App. Ct. Apr. 7, 2011).

In this case, the Supply Agreement, within "Schedule A," set specific prices for the

products that the Pace companies would manufacture for Best.  (Supp. Agr. 4–10.)  Moreover,

the Supply Agreement provided that "[a]ll prices shall hold for one year from the date of this

Supply Agreement, however, the Parties agree to review prices for products on a bi-annual

basis . . . ."  (Supp. Agr. 1.)  Despite this language, email evidence reflects that on various

occasions during 2007 the Pace companies requested price increases.  (*See* Def.'s Mem. Opp'n

Summ. J. Exs. B, C, D.)  A. Katz further testified in his deposition that Kehoe "kicked back"

purchase orders made pursuant to the Supply Agreement and threatened not to ship products

unless Best accepted price increases.  (A. Katz Dep. 149–50.)  Kehoe's recollection of price

increase negotiations was limited, but he stated that he did not recall price increases taking effect.

(*See* Kehoe Dep. 119–23.)

The Court finds a genuine dispute of fact regarding whether Best's performance under the

Supply Agreement was excused in light of price increases.[31]  Based on the record evidence, a reasonable jury could reach different conclusions regarding whether the Pace companies breached or repudiated the contract by repeatedly requesting price increases.  There is also a related question of fact as to whether Best accepted any of these price increases under economic duress.  Construing the evidence in favor of Plaintiffs, the trier of fact could reasonably conclude that the parties were simply negotiating price changes to the Supply Agreement due to changes in material costs.  Alternatively, viewing the email exchanges in combination with A. Katz's testimony, a reasonable jury could conclude that the Pace companies ignored the prices set under the Supply Agreement and coerced Best into paying increased prices.  Of particular note, Katz's contentions that Kehoe was threatening not to ship orders under the Supply Agreement without price increases—if credited—allows for the conclusion that the Pace companies' actions went beyond good faith negotiation.

Moreover, there is also a genuine factual dispute as to whether Best had other reasonable

---

[31]  Best also maintains that its performance is excused because the Pace companies breached the Supply Agreement by selling to customers in North America.  Best did not learn of this alleged breach until after the term of the Supply Agreement.  Accordingly, this conduct could not have motivated Best's non-performance.  At the same time, however, there is at least some authority suggesting that a party may rely on a legal excuse for nonperformance, even if the party was unaware of the excuse at the time of nonperformance.  *See, e.g., Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Comm'rs,*152 Ohio App. 3d 95, 111 (Ohio Ct. App. 2003) ("'A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact.  He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.'") (quoting  *College Point Boat Corp. v. United States*, 267 U.S. 12, 15–16 (1925)); *D'Andrea Bros. LLC v. United States*, — Fed. Cl. —, 2013 WL 500346, at *16 (Fed. Cl. 2013) ("Ignorance of a material breach does not preclude a party from relying on such a breach as justification for its failure to perform.").  Because the Court denies summary judgment on other grounds, it is unnecessary to reach the issue at this time.

alternatives at the time the Pace companies made their pricing demands.  Although the evidence

demonstrates that Best did have other suppliers for its products, A. Katz's testimony also

indicates that Kehoe timed demands in such a way as to make it impractical for Best—in light of

its obligations to customers—to turn to other suppliers for open orders.

Finally, assuming a jury were to find that repeated price increases breached the Supply

Agreement, it could also reasonable conclude that the Pace companies actions amounted to

material breach.[32]  In particular, presuming such circumstances, the factors of expected benefit

and good faith would weigh strongly in favor of material breach.  The terms of the Supply

Agreement indicate that fixed pricing for purchase orders was a large part of the benefit Best

received.  Accordingly, the trier of fact could find that repeated and continual failure to supply at

such pricing terms deprived Best of an essential part of its expected benefit.  Moreover, a finding

that the Pace companies repudiated or breached the supply agreement based on coercive and/or

unilateral price increases could also lead to the inference that the Pace companies were not

operating in good faith.

Accordingly, because factual disputes surround whether the Pace companies' actions

excused Best's nonperformance under the Supply Agreement, Pace Electronic is not entitled to

summary judgment as to its second breach of contract claim.[33]

---

[32]  There may be a separate issue as to whether Best actually elected to terminate the
contract in light of any alleged material breach or whether it chose to continue performance.
Plaintiffs assert, in a cursory fashion, that Best never declared the Supply Agreement terminated
or breached.  Plaintiffs, however, fail to develop this line of argument within their Motion for
Summary Judgment.  Accordingly, the Court reserves any determination on this issue.

[33]  The parties also dispute whether Pace Electronic has submitted sufficient evidence of
lost profits.  A party may recover lost profits for breach of contract by demonstrating that
"'profits were within the contemplation of the parties at the time the contract was made, the loss

47

### F.    Best's Counterclaim for Fraud

Pace Electronic, Pace Technology, and Counter-Defendant Kehoe also move for

summary judgment as to Best's counterclaims for fraud.  Best specifically maintains that during

the negotiation of the Supply Agreement Kehoe made a number of misrepresentations as to the

Pace companies' intentions not to compete with Best.  Plaintiffs and Kehoe assert, in part, that

even if Best can establish the other elements of fraud, there is insufficient evidence of reliance.

To establish fraud under Ohio law a plaintiff must demonstrate "(1) a representation,

failure to disclose, or concealment of a material fact; (2) made falsely, with knowledge of, or a

reckless attitude toward, its falsity; (3) with the intent of misleading another to rely on it;

(4) *actual and justifiable reliance*; and (5) resulting injury caused by the reliance." *Williams v.*

*Clarke*, No. 93973, 2010 WL 2783090, at *2 (Ohio Ct. App. July 15, 2010) (emphasis added)

(citing *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 55 (1987)); *see also Middleton v.*

*Rogers Ltd., Inc.*, 804 F. Supp. 2d 632, 640 (S.D. Ohio 2011) ("To prove a fraud in Ohio, a

plaintiff must demonstrate a material representation . . . which actually induces . . . detrimental

reliance.")

"A plaintiff can maintain a tort claim for fraud in the inducement or promissory fraud

---

of profits is the probable result of the breach of contract, and the profits were not remote and
speculative and may be shown with reasonable certainty.'" *Marion Forum, L.L.C. v. Lynick
Ents., Inc.*, No. 9–12–13, 2012 WL 6571388, at *10 (Ohio Ct. App. Dec. 17, 2012) (quoting
*Combs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St. 3d 241, 244 (1984)). Here, Pace
Electronic fails to adequately explain the basis for its lost profit calculation. Accordingly, even
assuming that Pace Electronic was entitled to judgment as to liability, it fails to provide sufficient
evidence demonstrating lost profits with reasonable certainty.

The parties' briefing also raises the issue of whether Pace Electronic may seek the lost
profits of Pace Products and Pace Technology. Neither party, however, cites any law on this
topic. Accordingly, the Court will not reach the issue at this time.

occurring in a contractual relationship because both theories raise separate and independent legal duties that are considered outside of the contract." *King v. Hertz Corp.*, No. 1:09 CV 2674, 2011 WL 1297266, at *3 (N.D. Ohio Mar. 31, 2011) (applying Ohio law). Promissory fraud requires "a promise without the present intention of performing." *Anderson v. Baker*, No. 08AP-438, 2008 WL 5423261, at *7 (Ohio Ct. App. Dec. 30, 2008). "A claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation." *Captiva, Inc. v. Viz Commc'ns, Inc.*, 85 F. App'x 501, 505 (6th Cir. 2004) (applying Ohio law, internal quotations omitted). Fraud in the inducement "relates not to the nature or purport of the contract, but to the facts inducing its execution." *Id.*

        In this case, regardless of how Best's fraud claims are labeled, Best fails to present evidence upon which to establish a genuine issue of material fact. Even assuming Best meets the other elements of fraud, Best fails to submit sufficient evidence that it actually relied on the representations and disclosures of Kehoe when it entered into the Supply Agreement. The evidence indicates that, during negotiations concerning the Supply Agreement, Kehoe made a number of statements and assurances reflecting that the Pace companies would not compete with Best. Nevertheless, the record evidence also clearly demonstrates that at the time of negotiations and contracting—due to the companies' prior business relationship—Best's officials and employees did not trust Kehoe. (*See, e.g.*, A. Katz Dep. 118.; Melbourne Haughton Dep. 64–65.) Because of this mistrust it was Best, as opposed to the Pace companies, that was insisting on an enforceable written agreement including strict non-compete and damage provisions. (*See* A. Katz Decl. ¶¶ 6, 8–12.) Under such circumstances, a reasonable jury could not conclude that Best actually relied on the statements and representations of Kehoe in entering into the Supply

Agreement.[34]  Accordingly, Plaintiffs and Kehoe are entitled to judgment on Best's fraud

counterclaims.

## G.     Best's Counterclaims under the Lanham Act

Best brings multiple counterclaims under Section 43(a) of the Lanham Act, 15 U.S.C.

§ 1125(a)(1), asserting that the Pace companies—and/or Kehoe—have engaged in the reverse

palming off of products; false advertising; and trade dress infringement.  Plaintiffs and Kehoe

move for summary judgment as to all of Best's Lanham Act counterclaims.  First, Plaintiffs and

Kehoe maintain that Best has no enforceable protections in the products in question.  Second,

they contend that Best's Lanham Act Counterclaims are untimely under the doctrine of laches.  In

the alternative, Plaintiffs and Kehoe maintain that they are entitled to judgment as to Best's

trade-dress claim based on Best's failure to submit evidence to support its alleged trade dress.

### 1.     Enforceable Interest in Products

Plaintiffs first contention is that Best's Lanham Act counterclaims fail because Best

lacked any enforceable protection over their products (such as a patent) and sold their products to

the public.  The Sixth Circuit authority Plaintiffs cite for this contention, however, stands for a

much narrower proposition relating to the misappropriation of trade secrets.  *See BDT Products,*

*Inc. v. Lexmark Intern., Inc.*, 602 F.3d 742, 755 (6th Cir. 2010) (indicating that once a product is

marketed it becomes difficult to prove that the subject matter is a trade secret).

---

[34]  The Court notes that A. Katz does aver that Kehoe ultimately "succeeded in
convincing me and Best [] of Pace's honorable intentions to be Best['s] supplier and not its
competitor . . . ." (A. Katz Decl. ¶ 13.)  Nevertheless, the overwhelming evidence, including A.
Katz's own Declaration, reflects that it was the Pace companies' acceptance of strict non-
compete contract terms, as opposed to any representations that Kehoe made in the negotiation
process, that led to the Supply Agreement.

Lanham Act claims are not limited to the misappropriation of trade secrets, but instead include other forms of unfair competition such as the passing off of products and false advertising. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1 (2003) (explaining that "reverse passing off" under the Lanham Act occurs when a person "misrepresents someone else's goods or services as his own"); *Tovey v. Nike, Inc.*, No. 1:12–cv–0448, 2012 WL 7017821, at *9 (N.D. Ohio July 3, 2012) (outlining basic elements of a claim for false advertising under § 1125(a)). Moreover, Lanham Act claims do not require independent intellectual property rights. *See, e.g., Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1238 (6th Cir. 1991) ("The protection against infringement provided by section 43(a) is not limited to 'goods, services or commercial activities' protected by registered trademarks."); *cf. also Clark v. Walt Disney Co.*, 642 F. Supp. 2d 775, 786 (S.D. Ohio 2009) ("[A]s the Supreme Court noted in *Dastar*, the Lanham Act was not designed to protect originality and creativity. To the extent that Plaintiff alleges that Defendants have misappropriated his intellectual property, his recourse lies in an action for patent infringement, not false designation of origin or deceptive trade practices.").

Here, Best does not bring a claim for misappropriation of trade secrets under the Lanham Act. Accordingly, Best's Lanham Act counterclaims do not fail simply because Best sells its products on the open market. Under such circumstances, Plaintiffs fail to identify a viable basis for summary judgment on such grounds.

### 2.      Doctrine of Laches

Plaintiffs and Kehoe also maintain that they are entitled to summary judgment pursuant to the doctrine of laches. They specifically contend that Best learned of the Pace companies

51

competitive activity as early as August 2004, but did not file its Lanham Act Counterclaims until September 2010. Best, on the other hand, contends that the "laches clock" should not begin to run until 2009, when Best was able to inspect products that Pace manufactured and sold for its own account. (*See* Pratha Dep. 87–91, ECF No. 74.)

Because the Lanham Act does not include a statute of limitations, "courts have applied the equitable doctrine of laches to determine whether a Lanham Act claim may be barred on the basis of a delay in filing." *Veracity Group, Inc. v. Cooper-Atkins Corp., Inc.*, No. 1:11–cv–526, 2012 WL 203415, at \*2 (S.D. Ohio Jan. 24, 2012). "For Lanham Act claims, the correct statute of limitations to borrow from Ohio is the two-year limitations period in Ohio Rev. Code § 2305.10 on claims for bodily injury or damage to personal property." *Logan Farms v. HBH, Inc. DE*, 282 F. Supp. 2d 776, 790 (S.D. Ohio 2003) The laches period begins to run when a plaintiff has "actual or constructive" knowledge of the activity that allegedly violated the Lanham Act. *Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 421 (6th Cir. 2010).

"If the lawsuit was filed before the analogous statute of limitations lapsed, there is a strong presumption that the delay in filing was reasonable." *Veracity Group*, 2012 WL 203415, at \*2. On the other hand, "when a plaintiff files suit outside that period, a rebuttable presumption arises that the delay was unreasonable and prejudicial to the defendant." *Id.* at 420. "A plaintiff may defeat the presumption of prejudice by: (1) rebutting the presumption; (2) demonstrating a good excuse for the delay; or (3) establishing the defendant engaged in conduct so egregious that it changes the balance of the equities in the plaintiff's favor." *Rocky Brands, Inc. v. Red Wing Shoe Co., Inc.*, No. 2:06–cv–00275, 2008 WL 4771848, at \*6 (S.D. Ohio Oct. 27, 2008).

Whether to dismiss claims pursuant to the doctrine of laches "involves mixed questions

52

of law and fact . . . ." *Carson v. Burke*, 178 F.3d 434, 436 (6th Cir. 1999). Additionally, "Unlike statutes of limitations, laches is not . . . a mere matter of time[,] but principally a question of the inequity of permitting the claim to be enforced." *Laukus*, 391 F. App'x at 420 (internal quotations omitted, alterations in original).

As a preliminary matter, the evidence presents a factual question as to when Best had actual or constructive knowledge of the Pace companies activity. Plaintiffs appear to contend that the laches period should begin to run in August 2004 due to an email A. Katz sent to Kehoe. (*See* Pl.'s Mot. Summ. J. Ex. D.) This email regarding the quoting of Best's customers, however, does not reflect that Best had either actual or constructive knowledge of the conduct forming the basis of its Lanham Act claims. (*Id.*) J. Katz deposition testimony also implies that Best began gaining at least some knowledge of the Pace companies' competitive activities in 2004, but the testimony is relatively imprecise as to exact timing. (*See* J. Katz Dep. 89, 91.) Other evidence reflects that Best learned considerably more information regarding the Pace companies' activities sometime between 2005 and 2006. (*See, e.g.*, Pl.'s Mot. Summ. J. Ex. D at 2–3.) Even then, however, the extent of Best's knowledge was limited. The evidence demonstrates that—following the Supply Agreement—Best did not discover the Pace products forming the basis of its Lanham Act claims until 2009.

Here, even assuming that the laches period began running sometime from late 2004 to 2006—creating a rebuttable presumption of the application of laches—Best has demonstrated a good excuse for its delay. The Sixth Circuit has acknowledge, within the context of laches, that "[a] reasonable businessman should be afforded some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on

the issue." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985). In this case, the progression of the parties' business relationship explains the delay on the part of Best. Although Best officials gained at least some knowledge that the Pace companies' were selling competing products from 2004 to 2006, the parties were initially able to resolve their general disagreements by entering into the Supply Agreement that included a non-compete provision. Accordingly, at the time the two-year time frame would have initially expired, Best had reason to think that any litigation was unnecessary.[35] Following the Supply Agreement, the evidence indicates that it was not until 2009 when Best discovered that the Pace companies had been duplicating—at least based on Best's interpretation of events—Best products for their own accounts. Applying this 2009 date, Best's September 1, 2010 filing date was within two years. Given these circumstances, the Court finds that Plaintiffs are not entitled to summary judgment based on the doctrine of laches.

### 3.     Trade Dress

In the alternative to judgment on all of Best's Lanham Act claims, Plaintiffs and Kehoe move for judgment as to Best's counterclaims for trade dress infringement. Best seeks trade dress protection for four different emergency light products. Plaintiffs maintain that Best has failed to sufficiently identify the elements of the trade dress. Additionally, Plaintiffs assert that Best cannot produce sufficient evidence to demonstrate that the trade dress is nonfunctional.

Trade Dress "has been described by the Supreme Court as the 'design or packaging of a product' which has acquired a 'secondary meaning' sufficient 'to identify the product with its

---

[35] Of course, hindsight makes clear that the Supply Agreement did not resolve issues between the parties.

manufacturer or source.'" *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539,

547 (6th Cir. 2005). The Sixth Circuit has further described:

> "'Trade dress' refers to 'the image and overall appearance of a product.' It embodies
> 'that arrangement of identifying characteristics or decorations connected with a
> product, whether by packaging or otherwise, [that] make[s] the source of the product
> distinguishable from another and ... promote [s] its sale.' " [*Ferrari S.P.A. Esercizio
> Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1238–39 (6th Cir. 1991)]
> (quoting *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812 (5th Cir.
> 1989), and *Mr. Gasket Co. v. Travis*, 35 Ohio App.2d 65, 299 N.E.2d 906, 912 n. 13
> (Ohio Ct. App. 1973)). Trade dress "'involves the total image of a product and may
> include features such as size, shape, color or color combinations, texture, graphics,
> or even particular sales techniques.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S.
> 763, 764 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (quoting *John H. Harland Co.
> v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983) (citing *Original
> Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 831 (11th Cir. 1982)
> ("adoption procedures used by [plaintiff] in the sale of its dolls qualify as protectable
> trade dress"), and *SK & F Co. v. Premo Pharm. Labs., Inc.*, 481 F.Supp. 1184, 1187
> (D.N.J. 1979) (stating that "[t]rade dress is a complex composite of features"
> including, inter alia, size, color, texture, and graphics, which must "be considered
> together, not separately"), *aff'd*, 625 F.2d 1055 (3d Cir. 1980))).

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 629–30 (6th

Cir. 2002).

To recover for trade dress infringement, a party must show "(1) the trade dress is not

functional; (2) the trade dress is distinctive in the marketplace and has acquired 'secondary

meaning,' thereby indicating the source of the goods; and (3) the trade dress of the accused

product is confusingly similar." *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 114

(6th Cir. 2006). The Sixth Circuit has further provided that "[i]t will not do to solely identify in

litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that

combination should be separated out and identified in a list." *Id.* at 415. "In requiring a list of

discrete elements, we are looking to avoid vague and indeterminate references to the overall

appearance or look of plaintiff's packaging." *Id.* (internal quotations omitted). The Sixth Circuit

has also indicated that "a plaintiff's inability to explain to a court exactly which aspects of its

product design(s) merit protection may indicate that its claim is pitched at an improper level of

generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea."

*Abercrombie & Fitch Stores*, 280 F.3d at 634 (internal quotations omitted)

Additionally, "a trade dress's nonfunctional nature must be proven by the party asserting

the trade dress protection." *General Motors Corp.*, 468 F.3d at 416. "In a trade dress

infringement case, the determination of functionality is a question of fact . . . ." *Market Masters,*

*Inc. v. Clinician's Choice Dental Products, Inc.*, 99 F. App'x 677, 681 (6th Cir. 2004). A

product's feature is functional "if it is essential to the use or purpose of the article or if it affects

the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a

significant non-reputation-related disadvantage." *General Motors Corp.*, 468 F.3d at 416

(internal quotations omitted). As some federal courts have explained a product feature is

essential if it "is the reason the device works," *Poly-America, L.P. v. Stego Industries, LLC*, 482

F. App'x 958, 959 (5th Cir. 2012) (internal quotations omitted), or "if it is dictated by the

functions to be performed . . . ." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings,*

*Inc.*, 696 F.3d 206, 219 (2nd Cir. 2012) (internal quotations omitted).

The Sixth Circuit has further explained that a trade dress, as a whole, can be non-

functional even though its individual elements are functional. *Antioch Co. v. Western Trimming*

*Corp.*, 347 F.3d 150, 158 (6th Cir. 2003). "[I]n order to receive trade dress protection for the

overall combination of functional features, those features must be configured in an arbitrary,

fanciful, or distinctive way." *Id.*

Finally, the Sixth Circuit recently outlined:

Under the competition theory of functionality adopted by the Sixth Circuit, we have considered two different tests, *Abercrombie*, 280 F.3d at 641 n. 16 and 642 (citations and internal quotation marks omitted), to determine whether a trademark is functional and, thus, not enforceable:

> The test for comparable alternatives asks whether trade-dress protection of certain features would nevertheless leave a variety of comparable alternative features that competitors may use to compete in the market. If such alternatives do not exist, the feature is functional; but if such alternatives do exist, then the feature is not functional . . . . The effective competition test asks . . . whether trade dress protection for a product's feature would hinder the ability of another manufacturer to compete effectively in the market for the product. If such hindrance is probable, then the feature is functional and unsuitable for protection. If the feature is not a likely impediment to market competition, then the feature is nonfunctional and may receive trademark protection.

*Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 679 F.3d 410, 418 (6th Cir. 2012).

At the same time, however, "[i]f a trade dress is found to be functional, the mere fact that there are other non-infringing designs which would serve the same functional purpose is no defense to functionality." *General Motors Corp.*, 468 F.3d at 416.

### a. Identification

Upon review, the Court finds that Best has sufficiently identified the trade dress in question. Best seeks trade dress protection as to the "shape and design features" of the four products in question. (Am. Counterclaim ¶ 108.) Within its counterclaims, Best provides an image of each product in question, a description of an overall design, and then a detailed description of each products' basic components. (*Id.* at ¶¶ 110–14.) Plaintiffs fault Best's description, maintaining that Best simply provides a laundry list of product elements rather than the trade dress in question. Although Best's description of the trade dress in question is perhaps

overly inclusiveness, the Court is not convinced that the descriptions are deficient to the point
that Plaintiffs are entitled to judgment. Rather, the Court finds that Best has sufficiently
identified the characteristics of each alleged trade dress. Notably, trade dress in itself is a
relatively broad concept incorporating "overall appearance of a product" and its "total
image . . . ." *Abercrombie & Fitch Stores*, 280 F.3d at 629.

      **b.**    **Functionality**

      The Court also finds that Best has submitted sufficient evidence to raise a triable issue of
fact as to the functionality of each trade dress. Construing the evidence in Best's favor, including
the testimony and reports of Best's expert, a reasonable jury could find that the trade dresses of
Best's products, as a whole, are nonfunctional. Specifically, Mr. Broehl's report indicates that
the products in question contain a number of features that influence the overall aesthetic of the
products, but that could have been designed in a number of ways. (*See* Broehl Report 2–6, June,
28, 2010, ECF No. 100.) Additionally, Mr. Broehl's report and testimony reflects that the four
products in question are unique in design from a variety of different versions of emergency
lighting products that competitors have created.[36] (*See id.* at 7–10; Broehl Dep. 10, 17–18, ECF
No. 70-1.) Such evidence allows for the inference that the aesthetic design of Best's products are
not essential or required features for the purposes of emergency lighting.

      In arguing that Best's product designs are primarily functional, Plaintiffs maintain that
Best's design choices serve the functional purpose of making the emergency lighting products
unobtrusive. Plaintiffs emphasize Mr. Broehl's testimony that "one of the objectives of these

---

[36] The June 28, 2012 expert report from Mr. Broehl also contains an appendix providing
examples of comparable emergency lighting products on the market. (Broehl Report 11–17,
June, 28, 2010.)

products is to be unnoticed until they need to be noticed." (Broehl Dep. 53.)  Even crediting this premise, an issue of fact remains.  Specifically, presuming that the unobtrusive nature of emergency lighting is a purpose of such products, there is still an issue of fact as to whether the design features of the Best products are essential to meet such a purpose.  Best submits evidence of the existence of a number of other aesthetic designs for emergency lighting.  Such evidence indicates that the goal of unobtrusiveness can be met in a variety of ways.  Accordingly, Plaintiffs and Kehoe are not entitled to summary judgment on such grounds.

## H.    Best's Counterclaims for Infringement of Catalogue

Plaintiffs, and Kehoe, next maintain that certain elements of Best's Counterclaims are preempted under the Copyright Act.  Specifically, Plaintiffs maintain that Best's fifth (tortious interference), eighth (Lanham Act-reverse palming off), and ninth (Lanham Act-false advertising) counterclaims all incorporate allegations that the Pace companies copied elements from Best's catalogue.

As an initial matter, Best brings its eighth and ninth counterclaims under the Lanham Act.  "The federal Copyright Act does not preempt the federal Lanham Act, or vice-versa.  In fact, it is common practice for copyright owners to sue for both infringement under the 1976 Copyright Act and unfair competition under the Lanham Act." *Alameda Films SA de CV v. Authors Rights Restoration Corp. Inc.*, 331 F.3d 472, 482 (5th Cir. 2003).  Accordingly, there is no basis for dismissal of such claims on the grounds of preemption.

Plaintiffs and Kehoe also seek preemption of Best's fifth counterclaim based on state-law

theories of tortious interference with business relationships and business expectations.[37]  The

Sixth Circuit has provided the following framework as to preemption under the Copyright Act:

> A state law claim will be preempted under Section 301 where two requirements are met. First, the work must come within the scope of the "subject matter of copyright" as set forth in Sections 102 and 103 of the Copyright Act. *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001).  Second, the rights granted under state law must be equivalent to any of the exclusive rights within the scope of federal copyright protection. *Id.*

*Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004).  With regard to the

equivalency requirement, the Sixth Circuit has stated:

> Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights. Conversely, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim.

*Id.* at 301 (quoting *Wrench*, 256 F.3d at 456).

In *Stromback*, the Sixth Circuit held that the Copyright Act preempted a state law claim

for interference with economic advantage.  *Id.* at 306.  In doing so, the Court stated "[g]enerally,

tortious interference claims . . . are held to be preempted because the rights asserted in such

claims are not qualitatively different from the rights protected by copyright." *Id.*

Applying the above law, to the extent Best's tortious interference with business

relationship counterclaim is based on the copying of Best's catalogue, the Copyright Act

preempts such claims.  The Court recognizes, as Best stresses, that the tortious interference

---

[37] Best's fifth counterclaim also seeks liability on a tortious interference with contract theory.  For reasons described below, the Court finds that Plaintiffs and Kehoe are entitled to summary judgment on Best's tortious interference with contract counterclaim in its entirety. Accordingly, it is unnecessary to decide whether the Copyright Act partially preempts this counterclaim.

claims also include a number of separate factual allegations.  Accordingly, to the extent such claims are based on separate conduct, preemption does not apply.

## I.  Best's Counterclaims for Misappropriation of Trade Secrets

Plaintiffs, and Kehoe, also contend that the Ohio Uniform Trade Secrets Act (OUTSA) displaces a number of Best's Counterclaims relating to the misappropriation of trade secrets. Plaintiffs specifically assert that Best's fifth (tortious interference), seventh (misappropriation), and thirteenth (fraud) counterclaims all involve allegations of the same basic facts that form the basis for Best's OUTSA counterclaim.

Best's seventh and thirteenth counterclaims require little analysis.  Although labeled as a misappropriation claim, Best's Seventh Counterclaim is actually for breach of the Supply Agreement's assignment provision.[38]  OUTSA does not displace "[c]ontractual remedies, whether or not based on misappropriation of trade secret . . . ."  Ohio Rev. Code § 1333.67(B). Accordingly, OUTSA does not displace Best's seventh counterclaim.  Moreover, the Court has already determined above that Plaintiffs and Kehoe are entitled to judgment on Best's counterclaims for fraud.  Consequently, it is unnecessary to address whether OUTSA displaces the thirteenth counterclaim.

Best's fifth counterclaim, based on various theories of tortious interference, requires further analysis.  OUTSA, with limited exceptions "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret."  Ohio Rev. Code § 1333.67.  This Court has recognized that such displacement applies to "all claims

---

[38]  Plaintiffs contend that because this is a breach of contract claim, Best cannot recover for punitive damages and attorney fees as it requests.  Nevertheless, the fact that Best might be barred from some of its requested relief is not adequate grounds for dismissal.

based on misappropriation of information even if that information does not rise to the level of a

'trade secret.'" *Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.*, 852 F.

Supp. 2d 925, 940 (S.D. Ohio 2012). "Where the common-law claim possesses an independent

factual basis separate from the factual allegations establishing a UTSA claim, then the portion of

the claim supported by an independent factual basis survives preemption." *Int'l Paper Co. v.

Goldschmidt*, 872 F. Supp 2d 624, 635 (S.D. Ohio 2012) (internal quotations omitted).

Here, Best's allegations demonstrate that their tortious interference claims are based

partially, but not solely, on allegations of the misappropriation of information that the Pace

companies gained through their relationship with Best. For example, Best accuses the Pace

companies and Kehoe of raiding information regarding Best's customer base and

misappropriating manufacturing secrets. To the extent Best's fifth counterclaim is based on

misappropriation of confidential information that the Pace companies gained from Best, the

counterclaim is preempted.[39]

## J.    Best's OUTSA Counterclaim

Plaintiffs and Kehoe next contend that Best's sixth counterclaim, for misappropriation of

trade secrets in violation of OUTSA, is time barred under OUTSA's four year statute of

limitations.[40] They specifically maintain that Best's period for filing began to run in August

---

[39] As Best maintains, and Plaintiffs do not appear to dispute, Best's fifth counterclaim
also contains allegations beyond the misappropriation of information. For the reasons described
above, to the extent it is based on independent facts, the fifth counterclaim survives preemption.

[40] Best contends that Plaintiffs failed to plead a statute of limitations defense.
Nevertheless, as detailed above, the Court permitted Plaintiffs and Kehoe to amend their
pleadings to plead additional affirmative defenses. Accordingly, the Court will consider
Plaintiffs' statute of limitations defense as properly pled.

2004, making its October 2, 2008 filing of their OUTSA counterclaim untimely.

"To prevail on a claim under the OUTSA, a plaintiff must establish (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Allied Erecting & Dismantling Co., Inc. v. Genesis Equipment & Mfg., Inc.*, Nos. 10–4180, 10–4583, 11–3008, 2013 WL 85907, at *11 (6th Cir. 2013) (internal quotation omitted). With regards to the filing of misappropriation claim OUTSA specifically states that "[a]n action for misappropriation shall be commenced within four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Ohio Rev. Code § 1333.66. Accordingly, the decisive issue regarding the commencement of the statute of limitations is when the plaintiff knew or should have reasonably known when the defendant was using trade secret information in an unauthorized fashion. In determining whether a party should have discovered wrongful conduct, the relevant inquiry is whether the facts known "would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry[.]" *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 181 (1984).

Under Ohio law, "[a]pplication of a statute of limitations presents a mixed question of law and fact." *Dalesandro v. Ohio Dep't of Transp.*, No. 10AP-241, 2010 WL 5238609, at *3 (Ohio Ct. App. Dec. 16, 2010). When the facts are undisputed, application of the statute of limitations is a question of law. *Id.* On the other hand, "[t]he determination of when a cause of action accrues is to be decided by the trier of fact." *Id.* Moreover, the party raising a statute of limitations defense has the burden of proof in establishing such a defense. *Matrix Acquisitions, LLC v. Hooks*, No. 10CA1112, 2011 WL 2464183, at *2 (Ohio Ct. App. June 15, 2011).

Here, the Court finds that Plaintiffs and Kehoe have failed to carry their burden of establishing that Best's OUTSA counterclaim is untimely. Specifically, the Court finds that a genuine factual issue remains as to when Best knew or should have known of the conduct forming the basis for its misappropriation counterclaim. Plaintiffs assume that Best knew of the alleged conduct in August 2004, when A. Katz emailed Kehoe asking him to refrain from quoting Best's customers. (*See* Pl.'s Mot. Summ. J. Ex. D.) As discussed above in addressing the doctrine of laches, however, the extent of Best's knowledge during this time frame is unclear from the record evidence. Much of the evidence indicates that it was during 2005 and 2006 when Best discovered the nature of the Pace companies' competitive activities. Under these circumstances, a reasonable jury could conclude that Best's October 2008 action was not untimely under the four year statute of limitations.[41]

## K.     Best's Tortious Interference Counterclaims

Plaintiffs and Kehoe also seek judgment as to Best's fifth counterclaim for tortious interference with contract and business relationships. With regard to Best's tortious interference with contract claim, Plaintiffs contend that Best has failed to identify any specific contract that was interfered with, and breached, as a result of Plaintiffs and Kehoe's actions.

"The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *PNH,*

---

[41] Within their briefing, Plaintiffs also contend, in a cursory fashion, that the Pace companies did not have any access to trade secret information. Nevertheless, Plaintiffs fail to develop this line of argument. Accordingly, the Court does not reach any determination as to this issue.

*Inc. v. Alfa Laval Flow, Inc.*, 130 Ohio St. 3d 278, 287 (Ohio 2011) (internal quotations omitted).

Similarly, "[t]o prevail on a claim for tortious interference with a business relationship, the

plaintiff must prove (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an

intentional interference causing a breach or termination of the relationship; and (4) damages

resulting therefrom." *Kelley v. Buckley*, 193 Ohio App. 3d 11, 32 (Ohio Ct. App. 2011).

"[I]nterference with the business relationship alone is insufficient to sustain a cause of

action for tortious interference." *Gracetech Inc. v. Perez*, No. 96913, 2012 WL 589473, at *6

(Ohio Ct. App. Feb. 23, 2012). Rather, "[i]t is the improper nature of the conduct that establishes

liability." *Id.* In determining whether actions are improper, the Supreme Court of Ohio has

applied the following guidance:

> We therefore adopt Section 767 of the Restatement, which provides guidelines to be
> followed in determining whether an actor's interference with another's contract is
> improper. Accordingly, in determining whether an actor has acted improperly in
> intentionally interfering with a contract or prospective contract of another,
> consideration should be given to the following factors: (a) the nature of the actor's
> conduct, (b) the actor's motive, (c) the interests of the other with which the actor's
> conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social
> interests in protecting the freedom of action of the actor and the contractual interests
> of the other, (f) the proximity or remoteness of the actor's conduct to the interference,
> and (g) the relations between the parties.

*Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 178–79 (1999). Both Ohio courts

and the Restatement suggest that when factual issues exist as to these factors, whether a

defendant's action are improper becomes a question of fact. *See Brookeside Ambulance, Inc. v.*

*Walker Ambulance Serv.*, 112 Ohio App. 3d 150, 157 (Ohio Ct. App. 1996) (holding that

whether a defendant's "actions were improper is a question for the trier of fact to determine after

it balances the factors set forth in Section 767 of the Restatement."); Restatement (Second) of

Torts § 767 cmt. l (1979) ("[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.").

Relatedly, general competition ordinarily does not constitute improper interference. *See id.* at § 768 (providing guidelines as to when competition equates to proper interference). Nevertheless, a competitor is prohibited from inducing a third person "not to enter into or continue a business relation with a competitor" by employing "wrongful means . . . ." *Belvino L.L.C. v. Empson (USA) Inc.*, No. 97305, 2012 WL 2580758, at *8 (Ohio Ct. App. July 5, 2012) (internal quotations omitted); *cf. also Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 309–10 (6th Cir. 2011) (explaining that, in interpreting the Restatement, § 767 factors relating to improper conduct are useful in considering whether a competitor has employed wrongful means).

Upon review, the Court finds that Plaintiffs and Counter-Defendant Kehoe are entitled to summary judgment as to Best's tortious interference with contract counterclaim. In responding to Plaintiffs' Motion, Best fails to identify—or submit evidence as to—any specific contract that was breached as a result of the Pace companies' actions. Best directs the Court to the deposition testimony of J. Katz for the proposition that the Pace companies' entry into the market had a detrimental impact on Best's contractual relationships. Although this testimony indicates that Best lost customers in light of this activity, the testimony does not demonstrate that a customer actually breached an existing contract. (*See* J. Katz Dep. 50–53.) Consequently, the Court finds that based on the evidence a reasonable jury could not find in favor of Best as to its tortious interference with contract counterclaims.

66

The record evidence, however, establishes material disputes of fact concerning Best's tortious interference with business relationship counterclaims. Construing the evidence in favor of Best, a trier of fact could find that the Pace companies' actions interfered with Best's existing and prospective business relationships. For example, the record implies that at least one of the companies Best sold products to based on purchase orders in late 2006, Astrolite, was a Best customer. (*See* Pl.'s Mot. Summ. J. Ex. D at 2.) Although J. Katz's testimony is admittedly general, it indicates that the Pace companies entry into the emergency lighting market interfered with Best's customer relationships, forced Best to lower its prices to remain competitive with the Pace companies, and resulted in damages to Best in the form of lost sales to its customer base. (*See* J. Katz Dep. 50–53.) Moreover, given that the Pace companies were Best's supplier dating back to 2000—and in light of the companies' ongoing disagreements regarding which customers the Pace companies were allowed to independently sell to—a reasonable jury could infer that the Pace companies developed a knowledge of Best's customer base. The question becomes, therefore, whether the Pace companies' activities in the market were improper or simply appropriate competition. This question rests on a number of unresolved factual issues relating to the nature of the Pace companies' conduct, the Pace companies' motive, and the relationship between Best and the Pace companies. Specifically, determining whether the Pace companies' actions were improper is interrelated with determinations as to the parties' intent in entering the Supply Agreement and whether the Pace companies have unjustifiably copied Best products. Under these circumstances, summary judgment is inappropriate as to Best's tortious interference with business relationships counterclaims.

67

**L.    Best's Request for Declaratory Judgment**

The parties next dispute the availability of declaratory judgment in this case. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201(a). Here, Plaintiffs maintain that declaratory judgment is inappropriate, because Best is only attempting to adjudicate, and hold Plaintiffs liable for, past conduct. The Court disagrees. This case involves not only past conduct, but also the rights and relationship of the parties moving forward, such as the Pace companies ability to use the designs of Best products in the future. Accordingly, judgment on this grounds is denied.

**M.    Best's Counterclaims as to Counter-Defendant Kehoe**

In addition to moving with Plaintiffs as to Best's Counterclaims, Counter-Defendant Kehoe also moves independently for judgment. Kehoe specifically contends that he is not individually liable for any of Best's breach of contract claims because there is no justification to pierce the corporate veil of the Pace companies. With regard to Best's tort counterclaims, Kehoe rests on the same contentions as Plaintiffs.[42] (*See* Pls.' Mot. Summ J. 39.) Best does not contend that the corporate veil should be pierced, but instead maintains that Kehoe is liable for his personal involvement in the various torts alleged.

---

[42] Within Plaintiffs' initial Motion for Summary Judgment, Counter-Defendant Kehoe fails to set forth or develop any independent argument as to why he is not individually liable for Best's various tort and Lanham Act counterclaims. In reply briefing, Kehoe attempts to set forth an argument that he had no personal participation in the alleged conduct. (*See* Pls.' Reply 32, ECF No. 77-6.) Because Kehoe failed to raise this issue on initial briefing, and only raised it in cursory fashion on reply, the Court will not consider this line of argument.

Under these circumstances, the Court agrees that Kehoe cannot be held individually liable as to Best' breach of contract counterclaims. Such claims include not only the first through fourth counterclaims, which do not name Kehoe, but also the seventh and fourteenth counterclaims, which—despite Best's labeling—rest on breach of contract theories. Accordingly, Kehoe is entitled to judgment on such claims.

**N.    Best's Patent Infringement Counterclaims**

Plaintiffs and Kehoe also move for judgment as to Best's counterclaims for patent infringement. Best concedes that discovery did not support its patent infringement counterclaims. Best, therefore, maintains that it no longer wishes to pursue such claims. Accordingly, judgment is granted as to these counterclaims.

**O.    Best's Conversion Counterclaim**

Finally, Plaintiffs move for summary judgment as to Best's counterclaim for conversion of its tooling. Within this counterclaim, Best maintains that Pace Electronic or Pace Technology has retained custody over, and failed to return, tooling that Best owns. Plaintiffs do not dispute that Pace Technology has retained possession of some tooling that Best owns.[43] Pace Technology maintains, however, that—to the extent Ohio law applies—such tooling is subject to a statutory lien pursuant to Ohio Revised Code § 1333.31.

The Court finds the parties Motions and briefing insufficient to allow for determination of these issues. Before reaching any decision as to conversion, or the application of any lien, the Court must initially determine the applicable law. According to Plaintiffs, the tooling in question

---

[43] Plaintiffs note, however, that the extent of Best's ownership of the tooling in question is a dispute of fact.

was created, used, and is currently stored in China. Best, the owner of at least some of the tooling, is an Ohio corporation. Moreover, the tooling is interrelated with the parties Supply Agreement, which applies Ohio law. (Supp. Agr. 3.) Such circumstances leave the Court with a relatively complex legal question as to what law to apply.[44] *Cf. Charash v. Oberlin College*, 14 F.3d 291, 296–99 (6th Cir. 1994) (outlining Ohio's choice of law analysis for conversion claim). Given the potential importance of this issue to any decision as to the conversion counterclaim, the Court finds that Plaintiffs have failed to establish that they are entitled to judgment as a matter of law. Accordingly, the Court denies Plaintiffs' Motion for Summary Judgment, as to conversion, at this time.[45]

## IV. CONCLUSION

Based on the foregoing, the Court rules as follows:

- Defendant/Counter-Claimant Best Lighting Products, Inc.'s Motions for Summary Judgment are **DENIED**. (ECF Nos. 54, 66.)

- Plaintiffs' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part subject to the conditions outlined in this Opinion and Order. (ECF No. 64.)

- Plaintiffs' Complaint in Case No. 2:10-cv-789 is **DISMISSED** without prejudice subject to the conditions outlined in this Opinion and Order.

- The Clerk is **DIRECTED** to **STRIKE** the Declaration of James J. Hooley. (ECF No. 72-1.)

---

[44] Because of the underlying choice of law issue, the Court will not reach the merits of Best's conversion counterclaim at this time. Nevertheless, the Court does note, as detailed above, that factual issues remain as to the ownership of tooling and the extent of any debt that Best owes to Pace Electronics.

[45] The Court recognizes that it must resolve the choice of law issue prior to trial. The Court will provide a briefing schedule for this matter at a later time.

**IT IS SO ORDERED.**

3 - 19 - 2013
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

71